Creighton E. MILLER, Administrator of the Estate of Maurice J. Moline, Plaintiff–Appellee,

v.

AMERICAN PRESIDENT LINES, LTD., on its own behalf and as successor in interest to American Mail Lines; Matson Navigation Company, Inc., on its own behalf and as successor in interest to the Oceanic Steamship Company; Pacific Atlantic Steamship Company; Isbrandtsen Lines; West Coast Shipping Company, Defendants–Appellants,

Foster Wheeler Corporation; General Electric Company; T & N, PLC; Westinghouse Electric Corporation; Owens–Corning Fiberglas Corporation; Keene Corporation; Owens–Illinois, Inc., Defendants–Appellees.

Nos. 91–3602, 91–3837.

United States Court of Appeals, Sixth Circuit.

Argued June 11, 1992.

Decided March 23, 1993.

Rehearing and Rehearing En Banc Denied May 10, 1993.

---

1452

Leonard C. Jaques (argued and briefed), Jaques Admiralty Law Firm, Detroit, MI, Robert Swickle, Pittsburgh, PA, for Creighton E. Miller.

Harold W. Henderson (argued and briefed), Richard C. Binzley, Russell W. Gray, Thomas A. Heffernan, Thompson, Hine & Flory, Cleveland, OH, Henry N. Ware, Jr. (argued), McGuire, Woods, Battle & Boothe, Richmond, VA, for American President Lines, Ltd.

David G. Davies (briefed), Ray, Robinson, Hanninen & Carle, Cleveland, OH, for amici curiae.

James W. Bartlett, III (argued and briefed), Wilson, Elser, Moskowitz, Edelman & Dicker, Baltimore, MD, Martin .J. Fallon, Kevin O. Kadlec, William D. Bonezzi, Jacobson, Maynard, Tuschman & Kalur, Cleveland, OH, for Foster Wheeler Corp.

Arlene C. Erlebacher, John A. Heller (briefed), Sidley & Austin, Chicago, IL, Michael R. Gallagher (argued), Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Alton L. Stephens, Jr., Timothy T. Brick, Gallagher, Sharp, Fulton & Norman, Cleveland, OH, for General Elec. Co.

Randall L. Solomon (briefed), Thomas H. Shunk, Wade A. Mitchell (argued), Elizabeth A. McNellie, Baker & Hostetler, Cleveland, OH, for T & N, PLC.

Donald A. Powell, Buckingham, Doolittle & Burroughs, Akron, OH, Scott S. Cairns (briefed), McGuire, Woods, Battle & Boothe, Richmond, VA, for Westinghouse Elec. Corp.

Michael D. Eagen, Cincinnati, OH, for Keene Corp.

Susan Healy Zitterman (briefed), Kitch, Saurbier, Drutchas, Wagner & Kenney, Detroit, MI, Robert A. Bunda, Theresa R. DeWitt, Bunda, Stutz & DeWitt, Toledo, OH, for Owens–Corning Fiberglas Corp.

John C. Stewart (briefed), Richard A. Papurt, Bunda, Stutz & DeWitt, Toledo, OH, for Owens–Illinois Inc.

Before: MERRITT, Chief Judge; MILBURN, Circuit Judge; and PECK, Senior Circuit Judge.

MERRITT, Chief Judge.

This is an asbestos case, an appeal from a judgment, following a jury verdict, holding defendant shipowners liable for the wrongful death of a seaman on theories of negligence and unseaworthiness, and from the dismissal of defendant shipowners' third party claims for indemnity and contribution from certain asbestos suppliers and manufacturers.

The case is one of twenty seaman's cases drawn from the Maritime Asbestos Docket to go to trial in the Northern District of Ohio on an accelerated schedule. The trial was divided into three phases: Phase I considered whether the plaintiff suffered an asbestos related disease and, if so, the amount of compensatory damages; Phase II dealt with liability and punitive damages; Phase III considered the shipowners' claims for indemnity and contribution against asbestos manufacturers and suppliers. The Phase I jury found that the plaintiff suffered from an asbestos related disease, and was due $166,000 in compensatory damages. The Phase II jury found the shipowners liable for the compensatory damages under negligence and unseaworthiness, and imposed punitive damages of $50,000 against each defendant for a total amount of punitive damages of $650,000. In Phase III, the District Court dismissed the shipowners' third party claims against the asbestos manufacturers and suppliers.

Defendant shipowners challenge the award of punitive damages; the denial of indemnification or contribution; the sufficiency of the evidence on the element of causation; the admission of testimony by certain of plaintiff's witnesses of whom the defendants had little notice; and the District Court's handling of a jury request for

a written copy of the jury instructions. We conclude that punitive damages are not available in this case, and that the issue of indemnity and contribution should be analyzed in terms of comparative fault rather than under the active-passive negligence doctrine applied by the District Court. On all other issues we affirm the judgment of the District Court.

## I. Facts

This action was originally brought by Maurice Moline, a retired seaman, based upon his exposure to asbestos and other toxic chemicals as a crew member on defendants' ships. He alleged negligence under the Jones Act, 46 U.S.C.App. § 688, and unseaworthiness under general maritime law. Upon his death in 1989, the action was assumed by his personal representative.

Moline was employed on defendants' ships from 1944–1951 and from 1953–1969. A number of witnesses testified that asbestos was used extensively on the ships on which Moline worked. It was used as insulation in the engine rooms, on ventilation ducts, and on steam pipes running through crews' quarters. The pounding of the ships on the ocean and the normal deterioration of this insulation created asbestos dust everywhere the insulation was used. Crew members asleep in their quarters would wake to find themselves coated with a thin layer of asbestos dust, and in times of bad weather the crew was forced to cover kitchen pots to keep them from being covered in asbestos dust. Asbestos was used in gaskets, as packing on ship valves, in fire brick mortar, in refrigeration units, in floor and ceiling tiles, as insulation cement, as spackling and joint cement, and in winches.

Moline performed a variety of jobs on board defendants' ships, including those of maintenance reefer, oiler, electrician and wiper. His jobs were all connected with the engine room and all involved work with asbestos. Asbestos was particularly common in the engine room where it was used on boilers to insulate and to prevent leaks. Asbestos blankets, boards and gloves were used to facilitate work on hot engine parts. Moline's work as an electrician required him to remove asbestos insulation to reach hidden wires and junction boxes. This was done with a hacksaw or other tool, and caused a good deal of asbestos dust. When replacing or repairing asbestos insulation, crew members would take asbestos powder from bags or cans, scooping it out by hand or with a coffee can, and mix the powder with water to make a bonding compound. As a wiper, Moline's job was to clean up after electricians and engine room workers.

Individual seamen and their union representatives made complaints about the high levels of asbestos dust, but remedial measures were minimal. They filed grievances about the presence of asbestos in the food and about seamen having to handle the substance. Complaints by union representatives about the prevalence of asbestos dust in the air sometimes resulted in efforts to clean out vents with shop vacuums, but more often were ignored. Whether defendants knew or should have known of the dangers of asbestos exposure at the time of these complaints is unclear.

The trial testimony did, however, make clear to the jury the dangers of extensive asbestos exposure. Expert testimony indicated that seamen faced risks of asbestos related disease comparable to insulation workers. Although all crew members were exposed to asbestos, the most dangerous area was the engine room. There was also medical testimony that exposure to asbestos can cause scarring of the lungs or lung lining. It is undisputed that Moline died of mesothelioma, an asbestos related disease which can arise from a relatively brief exposure to asbestos.

## II. Availability of Punitive Damages

Defendant shipowners first challenge the award of punitive damages, arguing that punitive damages are not available as a matter of law in a wrongful death action brought under the Jones Act and general maritime law. Defendants rely primarily upon a recent Supreme Court case, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct.

317, 112 L.Ed.2d 275 (1990), which held that certain nonpecuniary damages are not available in a wrongful death action brought under the Jones Act and general maritime law. The specific issue in *Miles* was whether the unavailability under the Jones Act of damages for loss of society and lost future income precludes recovery of these damages under a general maritime law unseaworthiness claim. The Court found that it does.

The district court declined to apply *Miles,* holding that because the Supreme Court did not address the specific question of punitive damages, *Miles* was not controlling. The district court refused, therefore, to "dismantle the longstanding availability of punitive damages in general maritime tort claims based on unseaworthiness" by extending *Miles.* For many years prior to *Miles,* punitive damages had been recognized as an appropriate remedy under general maritime law. *See The Amiable Nancy,* 16 U.S. (3 Wheat.) 546, 4 L.Ed. 456 (1818); *Protectus Alpha Navigation Co. v. North Pacific Grain Growers,* 767 F.2d 1379, 1385 (9th ·Cir.1985); *United States Steel Corp. v. Fuhrman,* 407 F.2d 1143 (6th Cir.1969). The Fifth Circuit has specifically held that punitive damages are available in a general maritime law unseaworthiness action for the wrongful death of a seaman. *In re Merry Shipping Inc.,* 650 F.2d 622, 626 (5th Cir. Unit B 1981).

The *Miles* decision is not, however, so easily dismissed because its reasoning, if not its holding, seems to cover the type of damages before us. Nonpecuniary damages also had a long history of acceptance in general maritime law before *Miles* held them unavailable in a seaman's wrongful death action. *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 589–90 n. 25, 94 S.Ct. 806, 817 n. 25, 39 L.Ed.2d 9 (1974). *Miles* addressed the same general question before this court, "the preclusive effect of the Jones Act for deaths of true seamen." *Miles,* 498 U.S. at 32, 111 S.Ct. at 325. The question before us is whether the unavailability of punitive damages under the Jones Act precludes recovery of punitive damages under a general maritime law unseaworthiness claim for the wrongful death of a seaman. Our analysis of ·this question must be guided by the reasoning of the Supreme Court·in *Miles.*

The *Miles* analysis begins with an evaluation of the historical development of the maritime wrongful death action. Prior to the passage of the Death on the High Seas Act and the Jones Act, there was no maritime wrongful death action under federal statutory law or general maritime law. *See Moragne v. States Marine Lines,* 398 U.S. 375, 393–94, 90 S.Ct. 1772, 1783–84, 26 L.Ed.2d 339 (1970). An injured sailor could bring an action for unseaworthiness or negligence, but his survivors had no remedy if he were killed. In 1920, Congress sought to remedy this situation by passing the Death on the High Seas Act and the Jones Act. The Death on the High Seas Act provided wrongful death actions in unseaworthiness and negligence to anyone killed more than three miles from shore.[1] The Jones Act provided seamen a wrongful death action in negligence.[2] Nonseamen killed in state territorial waters were left to rely upon state wrongful death statutes.

In 1970, the Supreme Court supplemented these remedies by creating a general maritime law cause of action for wrongful

---

1. 46 U.S.C.App. § 761 reads in part:
 Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation

which would have been liable if death had not ensued.

2. 46 U.S.C.App. § 688 reads in part:
 [I]n case of the death of any seaman as a result of any [personal injury in the course of employment] the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable.

death. *Moragne,* 398 U.S. 375, 90 S.Ct. 1772. *Moragne* involved a longshoreman killed in Florida territorial waters. His death was found to be the result of the unseaworthiness of the ship, but not of negligence. Because he was not a seaman he had no Jones Act claim, and because he was killed in state territorial waters the Death on the High Seas Act did not apply. The Florida wrongful death statute did not provide for an unseaworthiness action, so the plaintiff was left without a remedy.

The Court found that this result could not have been anticipated by Congress and was contrary to the intent of the Jones Act and the Death on the High Seas Act. At the time the Acts were passed, unseaworthiness was an obscure and little used cause of action. *Miles,* 498 U.S. at 25, 111 S.Ct. at 322. It became the primary source of recovery years later when the Supreme Court transformed unseaworthiness into a strict liability cause of action in *Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). *Miles,* 498 U.S. at 25, 111 S.Ct. at 322.

The change in the law of unseaworthiness emphasized certain inconsistencies in maritime wrongful death law:

> First, in territorial waters, general maritime law allowed a remedy for unseaworthiness resulting in injury, but not for death. Second, DOHSA allowed a remedy for death resulting from unseaworthiness on the high seas, but general maritime law did not allow such recovery for a similar death in territorial waters. Finally, in what *Moragne* called the "strangest" anomaly, in those States whose statutes allowed a claim for wrongful death resulting from unseaworthiness, recovery was available for the death of a longshoreman due to unseaworthiness, but not for the death of a Jones Act seaman.

*Id.* The *Moragne* court found that these inconsistencies could not have been anticipated by Congress, *id.,* and were contrary to the intent of Congress that the Jones Act contribute to "uniformity in the exercise of admiralty jurisdiction." *Moragne,* 398 U.S. at 401, 90 S.Ct. at 1788 (quoting

*Gillespie v. United States Steel Corp.,* 379 U.S. 148, 155, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964)). Further, the Court found that nothing in the Act or its legislative history showed any intent to foreclose nonstatutory federal remedies that might effectuate Congress' original intent. *Id.* 398 U.S. at 400, 90 S.Ct. at 1787.

Having found no affirmative congressional intent to preempt a general maritime law action for wrongful death, the Court examined the justification for the common law rule against recovery for wrongful death in admiralty cases. The Court found that the rule was an anomaly based upon the old English rule of felony-merger, and that it had never had a strong basis in the law of the United States. *Id.* at 384–86, 90 S.Ct. at 1779–80. The Court then looked at Congress' provision of wrongful death remedies under the Federal Employers' Liability Act, the Jones Act, the Death on the High Seas Act, and the Federal Torts Claims Act, and concluded that "there is no present public policy against allowing recovery for wrongful death." *Id.* at 390, 90 S.Ct. at 1782. These enactments were to be given their "appropriate weight not only in matters of statutory construction but also in those of decisional law." *Id.* at 391, 90 S.Ct. at 1782. The Court therefore approved a general maritime law wrongful death cause of action for unseaworthiness.

The details of this new cause of action were to be worked out through future litigation. *Id.* at 408, 90 S.Ct. at 1791. The Court contemplated that federal maritime wrongful death statutes would play an important role in this development. For example, in applying the doctrine of laches courts could look to the Death on the High Seas Act limitations period, "just as they have always looked for analogy to appropriate state or foreign statutes." *Id.* at 406, 90 S.Ct. at 1791. Of particular relevance to the present inquiry is the Court's statement that in deciding subsidiary issues "such as particular questions of the measure of damages, the courts will not be without persuasive analogy for guidance" in the Death on the High Seas Act and state wrongful death acts. *Id.* at 408, 90 S.Ct. at 1791.

Following *Moragne*, the *Miles* court addressed the question of the availability of certain forms of nonpecuniary damages by looking to the federal maritime wrongful death statutes for guidance. Of primary importance were the Jones Act, *Miles*, 498 U.S. at 36, 111 S.Ct. at 328 ("Because this case involves the death of a seaman, we must look to the Jones Act."), and the Death on the High Seas Act. *Id.* at 29, 111 S.Ct. at 324 (characterizing the *Moragne* action as an "extension of the DOHSA wrongful death action to territorial waters"). The *Miles* court was especially sensitive to the limits set by these statutes, explaining that the statutes could be supplemented in order to further "uniform vindication" of statutory policies, but that the Court must "keep strictly within the limits imposed by Congress." *Id.* at 27, 111 S.Ct. at 323. In the Death on the High Seas Act and the Jones Act, Congress had limited recovery to pecuniary losses. *Id.* at 31, 111 S.Ct. at 325. Because the plaintiff was a seaman, the Court relied primarily upon the Jones Act, holding that "[i]t would be inconsistent with our place in the constitutional scheme were we to sanction more expansive remedies in a judicially-created cause of action in which liability is without fault than Congress has allowed in cases of death resulting from negligence." *Id.* at 32, 111 S.Ct. at 326. The decision was also based upon the Court's desire to "restore a uniform rule applicable to all actions for the wrongful death of a seaman, whether under DOHSA, the Jones Act, or general maritime law." *Id.*

Under *Miles*, then, the goal of this court is to articulate a uniform rule regarding the availability of punitive damages in all actions for the wrongful death of a seaman. We are to be guided primarily by the congressionally enacted plan of maritime tort law. *Id.* at 27–28, 111 S.Ct. at 323. The centerpieces of this plan are the Jones Act and the Death on the High Seas Act. The Jones Act incorporates the substantive recovery provisions of the Federal Employers' Liability Act, including the judicial gloss. *Id.* at 31–32, 111 S.Ct. at 325. It has been the unanimous judgment of the courts since before the enactment of the Jones Act that punitive damages are not recoverable under the Federal Employers' Liability Act. *See Kozar v. Chesapeake and Ohio Ry.*, 449 F.2d 1238, 1240–43 (6th Cir.1971). Punitive damages are not therefore recoverable under the Jones Act. *Kopczynski v. The Jacqueline*, 742 F.2d 555, 560–61 (9th Cir.1984); *cf. Miles*, 498 U.S. at 32, 111 S.Ct. at 325 ("Incorporating FELA unaltered into the Jones Act, Congress must have intended to incorporate the pecuniary limitation on damages as well."). The Death on the High Seas Act explicitly limits recovery to pecuniary losses, and does not provide for punitive damages. *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1347 (9th Cir.1987).

*Moragne* relied upon four federal statutes in concluding that there was no present public policy against allowing recovery for wrongful death: the Federal Employers' Liability Act, the Jones Act, the Death on the High Seas Act, and the Federal Tort Claims Act. *Moragne*, 398 U.S. at 390, 90 S.Ct. at 1782. As shown above, the first three of these statutes do not allow recovery for punitive damages. The Federal Tort Claims Act also explicitly excludes punitive damages. 28 U.S.C. § 2674. Another relevant statute, enacted after the *Moragne* decision, is the Longshore and Harbor Worker's Compensation Act. 33 U.S.C. §§ 901–950. This statute creates a worker's compensation scheme for certain maritime workers which is exclusive of other remedies and does not provide for punitive damages. If it had been in force at the time of the *Moragne* decision, the *Moragne* plaintiff would have been foreclosed by the statute from bringing a general maritime law cause of action. *Miles*, 498 U.S. at 27–28, 111 S.Ct. at 323. These statutes, taken together, indicate that there is a general congressional policy disfavoring awards of punitive damages in maritime wrongful death actions.

Allowing punitive damages would create two major inconsistencies in federal maritime wrongful death law. First, punitive damages would be available for some deaths occurring in territorial waters but

not for deaths occurring on the high seas.[3] Second, punitive damages would be available for seamen's deaths occurring in territorial waters due to unseaworthiness but not for those due to negligence.[4] The *Moragne* action was created to remedy similar anomalies, and no court should reintroduce inconsistencies into federal maritime wrongful death law without strong policy reasons. *See Moragne*, 398 U.S. at 405, 90 S.Ct. at 1790 (arguing that public faith in the judiciary would be enhanced by the Court's decision to reject a rule which "produces different results for breaches of duty in situations that cannot be differentiated in policy"). To permit recovery of punitive damages in this case would only serve to irrigate what has been called the "Serbonian bog that is the law relating to a seaman's recovery for death and injury."[5]

While we recognize that punitive damages have long been available under general maritime law, and that "admiralty courts have always shown a special solicitude for the welfare of seamen and their families," *Miles*, 498 U.S. at 36, 111 S.Ct. at 327, we are bound by the reasoning of *Miles*. "We sail in occupied waters. Maritime tort law is now dominated by federal statute, and we are not free to expand remedies at will simply because it might work to the benefit of seamen and those dependent upon them." *Id.*

The only Supreme Court maritime wrongful death case to allow damages beyond those available under the Jones Act and the Death on the High Seas Act is *Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). Like *Moragne, Gaudet* involved a long-

shoreman killed in territorial waters. He was not, therefore, covered by the Death on the High Seas Act or the Jones Act. The issue was whether nonpecuniary damages were available under general maritime law when they were not available under the federal statutes. Relying on *Moragne*, the Court held that "the new maritime wrongful-death remedy [must] be guided by the principle of maritime law that 'certainly it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules.'" *Gaudet*, 414 U.S. at 583, 94 S.Ct. at 814 (quoting *The Sea Gull*, 21 F.Cas. 909 (C.C.Md.1865)). Because the Death on the High Seas Act and the Jones Act did not directly apply, the Court held that the longshoreman's widow could recover for the nonpecuniary loss of society.

Although *Gaudet* has never been overruled, its holding has been limited over the years to the point that it is virtually meaningless. The first case to limit *Gaudet* was *Mobile Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). *Higginbotham* involved a wrongful death action based on negligence, brought under the Death on the High Seas Act and general maritime law. The issue was whether the plaintiff could recover nonpecuniary damages under general maritime law when such damages were not available under the Death on the High Seas Act. The Court recognized that *Gaudet* was "broadly written," and could be read to authorize nonpecuniary damages for

---

**3.** The Death on the High Seas Act directly addresses the question of the availability of punitive damages in an action for wrongful death on the high seas, precluding recovery under general maritime law. *Cf. Mobile Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978).

**4.** The Jones Act directly addresses the question of the availability of punitive damages in a negligence action for the wrongful death of a seaman, precluding recovery under general maritime law. *Cf. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581.

**5.** *Karvelis v. Constellation Lines S.A.*, 806 F.2d 49, 51 (2d Cir.1986) (quoting John Milton, *Paradise Lost*, Book II, line 592 (1667) ("that Serbonian bog ... where armies whole have sunk")). The reference is to the marshy Lake Serbonis in Egypt in which, according to the ancient Greek historian Herodotus, whole armies were engulfed. Judge Mulligan was once asked why he would use a term as obscure as "Serbonian bog" in his opinions. He answered, "[nobody knows] what it means, but they know it's not good." Feerick, *Remarks Delivered on the Occasion of the Presentation of the Fordham–Stein Award to the Honorable William Hughes Mulligan*, 59 Fordham L.Rev. 479, 483 (1991).

wrongful deaths on the high seas. *Id.* at 622–23, 98 S.Ct. at 2013–14. Nevertheless, the Court limited *Gaudet* to coastal waters, *id.* at 623, 98 S.Ct. at 2014, sacrificing uniformity for adherence to congressional policy. The Court held that, "[a]s *Moragne* itself implied, DOHSA should be the courts' primary guide as they refine the nonstatutory death remedy, both because of the interest in uniformity and because. Congress' considered judgment has great force in its own right." *Id.* at 624, 98 S.Ct. at 2014.

*Miles* further limited *Gaudet,* holding that it "applies only in territorial waters, and it applies only to longshoremen." *Miles,* 498 U.S. at 31, 111 S.Ct. at 325. In other words, *Gaudet* was strictly limited to its facts. *Murray v. Anthony J. Bertucci Constr. Co.,* 958 F.2d 127, 130 (5th Cir. 1992). But as *Miles* itself recognized, after the passage of the Longshore and Harbor Workers' Compensation Act, *Gaudet* is no longer applicable on its facts. *Miles,* 498 U.S. at 30 n. 1, 111 S.Ct. at 325 n. 1. The case has therefore been condemned to a kind of legal limbo: limited to its facts, inapplicable on its facts, yet not overruled.

 Accordingly, we reject the reasoning of *Gaudet,* and follow instead the course set by *Moragne, Higginbotham,* and *Miles.* Looking primarily to the federal maritime wrongful death statutes for guidance, we hold that punitive damages are not available in a general maritime law unseaworthiness action for the wrongful death of a seaman.

### III. Indemnity and Contribution Claims

We now address the shipowners' claim that the District Court erred in finding that the shipowners were not entitled to indemnity or contribution from the asbestos manufacturers. The District Court, adopting the active-passive negligence theory articulated by the Fourth Circuit in *Vaughn v. Farrell Lines, Inc.,* 937 F.2d 953 (4th Cir. 1991), held that because the jury found the shipowners guilty of active negligence under the Jones Act, and awarded punitive damages requiring willful and wanton misconduct under the general maritime law of unseaworthiness, they were not entitled to indemnity. The District Court also determined that the finding of willful and wanton misconduct was the equivalent of a finding of intentional wrongdoing, so the shipowners were not entitled to a right of contribution from the asbestos manufacturers and other third parties.

The District Court held that an "active" tortfeasor may never obtain indemnification, but that a tortfeasor classified by the court as "passive" may obtain indemnification from an active co-tortfeasor. Applying the active-passive theory to this case, the court dismissed the shipowners' cross-claims for indemnification from the third party asbestos manufacturers and other product manufacturers because the jury found that the shipowners were "guilty of active negligence under the Jones Act and willful, wanton, and reckless misconduct in maintaining an unseaworthy vessel under the general maritime law of unseaworthiness."

 The active-passive negligence theory is doctrinally inconsistent with the general system of comparative fault in maritime law and we reject this approach. Instead we adopt a comparative causation approach to apportioning damages between tortfeasors which will satisfy the equitable goals of comparative fault while at the same time providing shipowners and maritime products manufacturers and suppliers with the proper incentives for safety.

A review of the historical roots of indemnity in maritime law reveals a continuing evolutionary process in which new forms of damage apportionment have been adopted to alleviate the harshness of older forms in an ongoing quest to make damage apportionment more closely reflect the relative culpability of each defendant. The active-passive analysis used by the District Court is inconsistent with this evolution.

Indemnity is an all-or-nothing remedy that shifts the entire amount of a loss from one party to the other. The law has long recognized the right of parties to make contractual agreements to compensate one another for anticipated losses or liability,

and thus express contractual indemnity provisions are usually enforced. Gorman, *Indemnity and Contribution Under Maritime Law*, 55 Tul.L.Rev. 1165, 1171 (1981). While a contractual agreement is clear evidence of a right to indemnification, "proof of a promise to reimburse ... [is] not required." I G. Palmer, *The Law of Restitution* § 1.5(d) (1978). Indemnity arose as an equitable means of correcting unjust enrichment in cases where, "without the express creation of [an indemnity contract], the liability of one party is seen to be secondary to that of another, giving rise to a right of restitution when he discharges his liability." *Id.* This "restitution indemnity" requires a comparison of the negligence of each tortfeasor. Gorman at 1171.

Noncontractual indemnity was recognized in general maritime law to escape the harsh effects of the ancient maritime rule of divided damages. Yeates, Dye and Garcia, *Contribution and Indemnity in Maritime Litigation*, 30 S.Tex.L.Rev. 215, 224 (1989). The divided damages rule, or rule of moiety ('the half of anything'), was an English maritime rule that divided damages equally between two parties when it was felt that both parties were at fault. *Id.* at 217–18. Although originally adopted by American courts as a "more equal distribution of justice" than the common law rule "which, at the time, precluded contribution among joint tortfeasors and permitted the plaintiff to force one of the wrongdoers to bear the entire loss," *id.* at 218, the divided damages rule was harsh when applied to a party that was only slightly at fault in causing a loss. *Id.* at 224. In response, the courts adopted the major-minor fault rule, which later became the active-passive negligence rule, to allow a negligent tortfeasor who was only "passively" negligent to recover indemnity from a tortfeasor whose "active" negligence caused the plaintiff's loss. *Id.*

In *Ryan Stevedoring Co. v. Pan–Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Supreme Court recognized a form of indemnity in maritime law that did not depend on the express provisions of a contract. The Court held that even absent a formal contract or express indemnity agreement, a stevedoring company that agreed to perform all stevedoring operations required by a shipowner was obligated to indemnify the shipowner for damages caused by the stevedore's unsafe stowage of the ship's cargo. Because the shipowner and stevedore had a stevedoring contract, the Court "did not meet the question of a noncontractual right to indemnity." *Id.* at 133, 76 S.Ct. at 237. The Court did, however, note that the equitable question of balancing the "respective responsibilities" of the parties had been discussed elsewhere in terms of "concepts of primary and secondary or active and passive tortious conduct." *Id.*

The Supreme Court dealt the divided damages rule a final blow in *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). There the Court adopted a comparative fault rule for maritime cases, noting that, "the rule of divided damages has continued to prevail in this country by sheer inertia rather than by reason of any intrinsic merit." *Id.* at 410, 95 S.Ct. at 1715. The Court held that maritime liability "is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." *Id.* at 411, 95 S.Ct. at 1716.

While some courts still apply the active-passive negligence doctrine, *see, e.g., Vaughn v. Farrell Lines, Inc.*, 937 F.2d 953 (4th Cir.1991), the introduction of a comparative fault system in maritime law has led many to question the need for the simplified active-passive distinction. In *Loose v. Offshore Navigation, Inc.*, 670 F.2d 493 (5th Cir.1982), the Fifth Circuit rejected the active-passive negligence doctrine as inequitable in a comparative fault system. The court reasoned that

comparative fault seeks the same objective [as the active-passive negligence indemnity rule] both more persuasively and more accurately. A comparative fault system ... apportions fault among joint tortfeasors in accordance with a

precise determination, not merely equally or all-or-none.... While the active-passive concept is more equitable than strict nonapportionment, there have never been satisfactory distinctions between the definition of "active" and "passive."

*Id.* at 501–02. The *Loose* court "emphasize[d] what other courts have said before us: The concepts of active ·and passive negligence have no place in a liability system that considers the facts of each case and assesses and apportions damages among joint tortfeasors according to the degree of responsibility of each party." *Id.* at 502. *See also, Elk Corporation of Arkansas v. Builders Transport, Inc.,* 862 F.2d 663, 666 (8th Cir.1988) (commenting that the active-passive approach to indemnity "finds little favor" today, and approving of the Fifth Circuit's analysis in *Loose*); D. Owen & J. Moore, *Comparative Negligence in Maritime Personal Injury Cases,* 43 La.L.Rev. 941, 954 (1983) (suggesting the comparative fault approach to indemnity). Apportionment of damages on the basis of comparative fault more nearly approaches the goal of placing the liability for maritime injuries on the party or parties whose acts or omissions really caused the harm than does the rough active-passive indemnity approach. Thus, a party held liable for a maritime injury may seek contribution from co-tortfeasors whether it is "actively" or "passively" negligent.

A comparative. fault system requires a comparison of the fault of one tortfeasor with the fault of others and assigns a percentage fault to each. These maritime asbestos cases, and other cases where co-tortfeasors' cross-claims may depend on theories of strict products liability, present a conceptual problem in applying comparative fault principles to forms of liability that are commonly understood as "no-fault." While it would seem illogical to compare the liability of a blameworthy party with that of a nonblameworthy party, the terms "fault" and "no-fault" are misleading as descriptions of the basis for liability. It is not conceptually impossible, or even impractical, to compare liability based on negligence with strict products liability under a comparative fault system.

We are not comparing "apples and oranges" or "mixing oil and water," the images used by some. *See, e.g., Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 385, 575 P.2d 1162, 1167 (1978).

While negligence is often thought of as "fault-based," this reference can be misleading because "much of the liability imposed for ... negligently interfering with legally protected interests is liability without moral fault." Keeton, *Prosser and Keeton on Torts* § 75 at ˙534 (5th ed. (1984)). Similarly, references to strict liability as liability "without fault," ignore the notion of fault that is inherent in the concept of strict liability. *See, e.g.,* M. Shapo, *The Law of Products Liability,* § 22.-03[2][a] (1987) (citing *Suter v. San Angelo Foundry & Machine Co.,* 81 N.J. 150, 406 A.2d 140, 146–47 (1979)). As Dean Wade has said of strict products liability:

> In the case of products liability, the fault inheres primarily in the nature of the product. The product is "bad" because it is not duly safe ... [S]imply maintaining the bad condition or placing the bad product on the market is enough for liability ... One does not have to stigmatize conduct as negligent in order to characterize it as fault.

Wade, *Products Liability and Plaintiff's Fault—The Uniform Comparative Fault Act,* 29 Mercer L.Rev. 373, 377 (1978). "[I]t may be questioned whether 'fault,' with its popular connotation of personal guilt and moral blame, and its more or less arbitrary legal meaning, which will vary with the requirements of social conduct imposed by the law, is of any real assistance ... except perhaps as ·a descriptive term." Keeton, *supra* § 75 at 537.

■ Courts and jurors are fully capable óf weighing the relative responsibility of strictly liable defendants against that of negligent defendants. *National Can Co. v. Vinylex Corp.,* 687 F.Supp. 375, 380 (N.D.Ill.1988). Requiring juries to compare negligence with strict liability under a comparative fault system is not very different from what juries normally do under such a system, particularly in maritime law cases.

In *Seas Shipping Co. v. Sieracki*, the Supreme Court described the concept of unseaworthiness as "essentially a species of liability without fault." 328 U.S. 85, 94, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946). Shortly thereafter, the Court decided in *Pope & Talbot, Inc. v. Hawn* that a plaintiff's own negligence should be considered to determine the amount of his recovery in an unseaworthiness action. 346 U.S. 406, 408–409, 74 S.Ct. 202, 204–205, 98 L.Ed. 143 (1953). Since then courts have applied comparative fault to strict liability unseaworthiness claims. *See Chotin Transportation, Inc. v. United States*, 819 F.2d 1342, 1354 (6th Cir.) (Milburn, J. concurring in part and dissenting in part) (citing cases), *cert. denied*, 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 371 (1987). This application appears to have posed little problem in cases tried by juries. *Daly*, 144 Cal.Rptr. at 388, 575 P.2d at 1170 (citing *Price v. Mosler*, 483 F.2d 275, 277–78 (5th Cir. 1973)).

■ In addition to unseaworthiness claims, comparative fault applies to maritime personal injury actions under the Jones Act, the Death on the High Seas Act, and to longshoremen's suits against vessels under the Longshore and Harbor Workers' Compensation Act. The Death on the High Seas Act, for example, specifically provides that the court "shall take into consideration the degree of negligence attributable to the decedent and reduce the recovery accordingly." 46 U.S.C.App. § 766. Refusing to apply comparative fault principles to maritime products liability claims might "balkanize [the] uniformity and generality" that is a hallmark of maritime law. *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1428 (5th Cir.1983). To allow indemnity only for claims based on strict products liability while all other maritime claims are subject to contribution based on comparative fault would cause seamen to "attempt to escape the comparative fault of the traditional theory of unseaworthiness and label their case (sic) products cases." *Id.* at 1429. This could lead to forum shopping by seamen seeking to obtain recovery under products liability theories without reduction for their own contributory fault. *Id.*

The application of comparative fault to claims against product manufacturers liable on the basis of strict liability should not reduce incentives for safety. Strict liability for unreasonably unsafe products arises when the seller is "engaged in the business of selling such a product," and the product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold," even though "the seller has exercised all possible care," and the "user has not bought the product from or entered into any contractual relationship with the seller." Restatement (Second) of Torts § 402A. The policy underlying strict liability is to place the burden of preventing the harm on the party best able to prevent the harm. *See, e.g., East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986). The manufacturer bears the burden of its unsafe products rather than the injured consumers who are said to be "powerless to protect themselves." *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901 (1963) (in bank).

The consumer protection effect of strict products liability is not diminished by comparative fault because plaintiffs are still relieved of the burden of proving negligence on the part of the manufacturer and plaintiffs' recovery is reduced only to the extent that their lack of reasonable care contributed to the injury. *Lewis v. Timco*, 716 F.2d at 1431 (citing *Daly*, 144 Cal.Rptr. at 386, 575 P.2d at 1168). Furthermore, manufacturers cannot assume that users of defective products will be contributorily negligent, so their incentive to produce a safe product will not be lessened. *Id.* (citing *Daly*, 144 Cal.Rptr. at 387, 575 P.2d at 1169). As the *Daly* and *Lewis* courts noted, the application of comparative fault principles to strict liability may actually provide more protection for consumers by relieving the inequities associated with absolute defenses such as contributory negligence that "provide windfalls to manufacturers." *Id.*

■ Applying comparative fault principles to strict liability does not abrogate indemnity in all situations. Indemnity is still available in cases where parties have made express contractual indemnification agreements, and in cases of purely vicarious liability. It is also available for a non-negligent tortfeasor upon whom the law imposes responsibility—under a theory of constructive liability or imputed fault—from a co-debtor that is guilty of actual fault. *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 833 & n. 12 (5th Cir.1992) (quoting *Marathon Pipe Line Co. v. Drilling Rig ROWAN/ODESSA*, 761 F.2d 229, 236 (5th Cir.1985)). As the Hardy court said, "[a]n ordinary defendant ... is adequately protected under the comparative negligence system. If the jury determines that an ordinary defendant is not negligent, then the defendant does not owe the plaintiff damages and has no need to pursue an indemnity action...." *Id.* at 833.

Other Circuits that have considered the question of the applicability of comparative fault to maritime products liability actions have reached the same conclusion we reach today. *See Pan–Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129 (9th Cir.1977); *Lewis v. Timco*, 716 F.2d 1425 (5th Cir.1983). Thus we reverse the ruling of the District Court enforcing an active-passive rule and declining to allow contribution based on comparative fault.

## IV. Sufficiency of Evidence to Show Causation

Defendants argue on appeal there was insufficient evidence presented at trial to create a jury question regarding causation. They challenge the finding of causation on two bases: first, plaintiff failed to present sufficient evidence regarding the extent of exposure to satisfy the requisite proximate cause standard of tort liability; second, plaintiff failed to establish a causal link between Moline's death and any exposure associated with a particular defendant.

■ Under the Jones Act, a plaintiff need only show that the defendant's negligence, however slight, contributed in some way toward causing the plaintiff's injuries. *Gosnell v. Sea–Land Service, Inc.*, 782 F.2d 464, 467 (4th Cir.1986). Plaintiff below also recovered under the general maritime action of unseaworthiness, which carries a higher causation requirement: "A plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). *See generally 1B Benedict on Admiralty § 28*, at 3–159 to 163 (7th Ed.1991).[6] Since we find the higher standard of causation under unseaworthiness was met, it is unnecessary for us to address the lesser Jones' Act requirement.

■ Defendants unsuccessfully urged below and assert again in their brief on appeal that the proper proximate cause standard for unseaworthiness is a "frequency, regularity, intensity, duration" test. They further assert that the district court recognized a lack of evidence satisfying this test during a conference in chambers concerning the jury charge (Brief of Defendant–Appellants APL and Matson at 23). A closer inspection of the record, however, reveals that Judge Lambros actually determined that such a showing was not required:

6. A few courts have equated the burden of causation for Jones Act and unseaworthiness claims. *See, e.g., Farnarjian v. American Export Isbrandtsen Lines, Inc.*, 474 F.2d 361, 363 (2d Cir.1973) ("defendant would be liable if its negligence or the unseaworthiness of the vessel was a proximate cause, in whole or in part, of plaintiff's fall"); *Peymann v. Perini Corp.*, 507 F.2d 1318, 1324 (1st Cir.1974) ("the Jones Act expressly imposes liability upon the employer to

pay damages for injury or death due in whole or in part to its negligence ... [b]ut so does the law of unseaworthiness") (citations omitted). We have adopted the majority view. *Daughenbaugh v. Bethlehem Steel Corp.*, 891 F.2d 1199, 1207 n. 3 (6th Cir.1989) (plaintiff's unseaworthiness claim failed under traditional proximate cause analysis, but her Jones Act claim withstood more liberal causation standard unique to Jones Act and FELA.)

I'll let you argue that frequency, regularity and intensity, but I'm not going to charge it because it will ... permit them to infer that the judge has suggested that the disease only be caused if there is a frequent exposure, as regular exposure, and intense exposure. And there is no evidence in this case *that that's required.*

Tr. vol. 12 at 1068–69 (emphasis supplied). We affirm the district court's holding that the correct standard for a finding of proximate cause is the "substantial factor" test.

▪ Applying this test to the facts adduced at trial, we must find the evidence sufficient to support the jury's verdict "unless, when viewed in the light of those inferences most favorable to the non-movant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ." *Monette v. AM–7–7 Baking Company, Ltd.,* 929 F.2d 276, 280 (6th Cir.1991). The record is full of evidence concerning the presence of asbestos dust throughout the ships on which Moline lived and worked for prolonged periods, from the engine rooms where he labored as a wiper, reefer and electrician to the crew's living quarters. Asbestos-lined pipes ran inches from crew members' bunks and blanketed them with dust that vibrated free overnight during rough weather. Crew members complained more than once of asbestos dust in their food. There was sufficient evidence for a reasonable jury to conclude that repeated and heavy exposure to asbestos was not only possible but inescapable.

The shipowners also assert that the testimony of plaintiff's two expert witnesses was insufficient to establish a nexus between any asbestos exposure and the decedent's death. Their argument is based on two premises: first, that in any case involving asbestos-related disease, the plaintiff must present expert medical testimony to establish the causal relationship between the asbestos exposure and his injury; and second, the evidence plaintiff presented at trial was insufficient to satisfy this standard. They rely especially on two state court decisions, *Money v. Manville Corp. Asbestos Disease Compensation Trust Fund,* 596 A.2d 1372 (Del.1991), and *Sholtis v. American Cyanamid Co.,* 238 N.J.Super. 8, 568 A.2d 1196 (Ct.App.Div. 1989). In *Money,* the court expressly held that "to make a prima facie showing with respect to the cause of an asbestos-related disease, a plaintiff must introduce direct competent expert medical testimony that a defendant's asbestos product was a proximate cause of the plaintiff's injury," because "the causal nexus between exposure to an asbestos product ... and a particular asbestos-related disease is not a matter of common knowledge." *Money,* 596 A.2d at 1377. The *Sholtis* court refrained from setting down an ironclad rule, writing that "[e]xpert proof would *usually* be required to establish, even inferentially, that the exposures caused or exacerbated plaintiffs' eventual injuries." *Sholtis,* 568 A.2d at 1207 n. 16 (emphasis supplied).

▪ We are not persuaded by these authorities. Although we express no opinion on the correctness of the results reached in *Money* and *Sholtis,* we are not prepared to *require* expert medical testimony to establish causation in every case concerning asbestos-related disease.[7] While we recognize that defendants should not be subjected to open-ended liability based solely on a jury's inexpert speculation concern-

---

7. Our holding is consistent with the decisions of other circuit courts. The Fourth Circuit did not require medical testimony in *Roehling v. Nat'l Gypsum Co. Gold Bond Bldg. Products,* 786 F.2d 1225 (4th Cir.1986), holding that when a plaintiff can establish that she was in a vicinity in which asbestos dust from defendants' products was inhaled, "a jury can reasonably infer therefrom that plaintiff was injured by defendants' products." *Id.* at 1228 (defendant asbestos manufacturers not entitled to summary judgment on basis of plaintiff's failure to directly prove expo-

sure to individual manufacturer's products). The Fifth Circuit followed similar reasoning in *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1094 (5th Cir.1973) (where plaintiff establishes that he contracted an asbestos-related disease from inhaling asbestos dust and that he was exposed to the products of defendant manufacturers on many occasions, the jury may infer from strong circumstantial evidence that each defendant was the cause in fact of plaintiff's injury).

ing proximate cause, we do not believe that the jury in this case was forced to make such an unreasonable conjectural leap to find for the plaintiff. Here the other evidence concerning harmful exposure to asbestos dust was strong, and plaintiff's evidence on causation was bolstered by the probative testimony of two medical expert witnesses at trial. In Phase I of the trial, Dr. Steven Levin testified that seamen faced risks of asbestos-related disease similar to insulation workers, except that their exposure could be as much as triple that of the insulators because of the 24–hour per day nature of their job. This testimony was read to the jury in Phase II. Dr. Howard Ayres, an industrial hygienist, also testified concerning the harmful effects of asbestos dust. We hold that the evidence was sufficient to support the jury's conclusion that the asbestos aboard defendants' ships was a substantial factor in Moline's death.

■ Plaintiff asserts that defendants' claims of error concerning the sufficiency of the evidence were not preserved for appeal under Rule 50(a), Fed.R.Civ.P. However, at the close of the evidence in this trial, the district court summarily denied the motions for directed verdict:

THE COURT: Any argument?

MR. HEFFERNAN: Who goes first?

MR. KRISPIN: Certainly, there will be—your Honor, it's up to the Court's discretion in how the Court wishes to discuss this issue.

THE COURT: I have been in here with all of you two weeks. I heard the evidence. I am satisfied there is sufficient evidence on all of the issues of negligence and unseaworthiness to submit the case to the jury. *And I am going to overrule all the motions, exceptions noted, I have.*

Tr. Vol. 11–A, p. 1030 (emphasis supplied).

As plaintiff admits in his brief, defendants moved for directed verdict three times. On the first two occasions, the district court did not permit argument. At

the close of the plaintiff's rebuttal evidence the district court overruled the motions summarily. Judge Lambros apparently considered himself sufficiently apprised of the moving parties' positions. We find that the "particular purpose" of the Rule was served, and that the proceedings below do not bar us from considering defendants' claim on appeal. *See Riverview Investments v. Ottawa Community Improv. Corp.,* 899 F.2d 474, 477 (6th Cir.), *cert. denied,* 498 U.S. 855, 111 S.Ct. 151, 112 L.Ed.2d 117 (1990) (judgment notwithstanding the verdict permitted where the trial court had indicated to the parties that the technical requirements of Rule 50 had been met, even though the movants in that case had not renewed their motion at the close of all the evidence; application of the Rule "should be examined in the light of the accomplishment of its particular purpose as well as in the general context of securing a fair trial for all concerned in the quest for truth," quoting *Boynton v. TRW, Inc.,* 858 F.2d 1178, 1185 (6th Cir.1988)).

## V. Trial By Ambush

Defendants assert that they were prevented from sufficiently preparing to meet the testimony of plaintiff's witnesses because the identities and subject matter of several of these witnesses were not disclosed prior to trial, in violation of the pretrial procedures instituted by Judge Lambros.[8] They claim that the district court's decision to permit these undisclosed witnesses to testify (over defendants' strenuous objections) amounted to a "trial by ambush" constituting reversible error. They request a new trial.

To support their claim, defendants point out that of the 111 crew members listed by plaintiff as possible witnesses in Phase I of the trial, only two were called, and three other crew members were allowed to testify who did not appear on the list. Furthermore, of the three medical experts on plaintiff's witness list, none were called to testify, and two experts not on the list, Drs.

---

**8.** To facilitate discovery in the multi-party, multi-case MARDOC litigation, Judge Lambros devised a Case Management Plan that utilized Consolidated Discovery Requests ("CDRs") in lieu of standard interrogatories. The witness lists were included in these CDRs.

John Burrows and Stephen Levin,. were permitted to testify (over defendants' objections). Defendants were not permitted to depose Burrows, and were only allowed to depose Levin the morning before his afternoon testimony. Finally, in Phase II, retired U.S. Coast Guard captain Clarence Hall and industrial hygienist Howard Ayres, M.D., were permitted to testify even though they did not appear on plaintiff's witness list, and defendants assert they were not informed of the subject matter of the testimony in a timely fashion.

We start with the established rule that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). In particular, this court has held that where a judge has determined that testimony is otherwise admissible, the mere fact that the party seeking its introduction has not fully complied with pretrial orders does not mandate its exclusion:

> The trial judge must be permitted wide latitude in guiding a case through its preparatory stages. His decision as to the extent that pretrial activity should prevent the introduction of otherwise competent and relevant testimony at trial must not be disturbed unless it is demonstrated that he has clearly abused the broad discretion vested in him....

*Davis v. Duplantis*, 448 F.2d 918, 921 (5th Cir.1971).

■ Defendants bear a heavy burden in seeking a new trial. Discovery matters "come within the discretion of the trial court and do not amount to reversible error unless there is an abuse of discretion and substantial prejudice." *International Union, UAW v. Michigan*, 886 F.2d 766, 771 (6th Cir.1989). "In order to prevail on his motion for a new trial, plaintiff must show that he was prejudiced and that failure to grant a new trial is inconsistent with substantial justice." *Erskine v. Consolidated Rail Corp.*, 814 F.2d 266, 272 (6th Cir. 1987). Applying this standard to the facts in this case, we hold that the district court did not commit reversible error by allowing the witnesses to testify.

This is a bitterly contested lawsuit. In their roles as zealous advocates, counsel for both sides have been uncooperative. While we do not condone the practices engaged in by plaintiff of which defendants complain, we find similar conduct on both sides.

The unnecessarily antagonistic relationship continued throughout Phase II of the trial. Both sides persisted in refusing to identify their witnesses. The following excerpt from court proceedings on May 1, 1991 is illustrative:

> THE COURT: Let's go home.
>
> MR. HEFFERNAN (for defendants): Once again I just want to mention that I have—not only do I not have a report of what this expert is going to say, I don't even know the identity of the expert. Here we are less than 48 hours before his appearance. And so I will claim when he goes on the stand some prejudice. I can't even prepare a counter defense to a witness whose identity I do not know, and not one iota except for what we talked about here today as to what he is going to testify here by hook and jab.
>
> MR. KRISPIN (for plaintiff): Part of my response to Mr. Heffernan, had I been provided those persons within APL who possessed knowledge that this person would testify to, I wouldn't need to bring in an independent witness.
>
> MR. HEFFERNAN: Hook and jab.
>
> THE COURT: Well, it's clear and apparent that what counsel has got to agree upon, and I'm hopeful that it will be the product of this lawsuit, and the previous lawsuit, that you people are going to come up and [ ] agree on a pecking order in the management and putting together [of] these cases. The issue doesn't have to be knocked [sic] down drag out fight.
>
> . . . . .
>
> MR. KRISPIN: Along that same vein, your Honor, can I get Mr. Heffernan to identify the number of and type of

witnesses he expects to be calling by Friday a.m.?

THE COURT: Why don't you—

MR. HEFFERNAN: As soon as he gets me the name of the doctor.

Tr. vol. 5 at 225–26. Under the circumstances, it is understandable that Judge Lambros would have minimal sympathy for either side's complaint of a lack of cooperation from opposing counsel.

Furthermore, defendants have failed to demonstrate actual prejudice. As Judge Lambros pointed out shortly before Dr. Ayers took the stand:

> I realize that Dr. Ayers was not on the witness list, and in that regard, there was no opportunity for discovery that is usually associated with persons who are known to give expert testimony, scientific testimony.
>
> Their special training, background and knowledge is the reason for the calling of a witness to address certain issues. Nonetheless, I am mindful that both sides are well aware of the nature of asbestos-related injuries, the dynamics of the litigation process, have an awareness of the science and knowledge that is available in this particular area.
>
> I really don't know where it will seriously hamper the Defense....

Tr. vol. 8 at 563. Our examination of the record reveals no point in the proceedings where defense counsel appeared genuinely surprised or otherwise prejudiced by the tactics of plaintiff's counsel.

Again, we do not condone the tactics of counsel on either side of this case. The Federal Rules of Civil Procedure upon which the pretrial orders of Judge Lambros were based are intended "to make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *Brown Badgett, Inc. v. Jennings*, 842 F.2d 899, 902 (6th Cir.1988). However, "[e]very trial judge is charged with the primary responsibility of ensuring that the judicial proceedings over which he presides are carried out with decorum and dispatch and thus has very broad discretion in ordering the day-to-day activities of his court."

*CBS, Inc. v. Young*, 522 F.2d 234, 241 (6th Cir.1975). On the record before us, we are unable to find that the district court abused his very broad discretion. We therefore decline to substitute our own judgment for his by remanding the case for a new trial on the grounds of "trial by ambush."

## VI. Ex Parte Response to Jury Request

Defendants also assert error in the district court's handling of a written request from the jury. Judge Lambros set out the facts in a post-trial order dated June 25, 1991, and defendants do not challenge his account of the facts. The jury, after receiving the oral charge in open court, retired to consider its verdict. Soon thereafter, they sent a note requesting a written copy of the instructions. The court reporter was out to lunch, but upon her return, she began transcribing the charge. Upon her completion of 14 of the 26 pages, Judge Lambros sent those pages to the jury with a note promising the remaining pages as soon as the entire transcription was done. Before the transcription could be completed, the jury reached its verdict.

Defendants assert that the court erred in not notifying the parties of the inquiry, in responding to the inquiry, and in not preserving the written inquiry for the record. In support of their position, defendants cite two Supreme Court cases, *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853 (1919), and *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), neither of which is in point. In each case, the Supreme Court reversed a jury verdict reached after the trial court issued supplementary instructions to the jury in response to their written request. In *Fillippon*, the jury sent a detailed written question to the trial judge concerning contributory negligence, to which the judge responded in equal detail with a supplementary instruction to which the parties had no opportunity to object. In *Rogers*, the jury wrote the judge asking if they might return a verdict of "Guilty as charged with extreme mercy of the Court," to which the judge responded in the affirmative. In each case, the judge gave the

jury an added instruction in which the substantive rights of the defendant were directly affected. He did so without giving the parties adequate notice and an opportunity to respond.

In this case, however, the district court merely provided a transcript of the charge delivered earlier in open court. The court wrote in its Order of June 25, 1991:

No supplementary instructions were given to the jury. The written charge that was provided to the jury did not add to, nor did it interpret, the oral charge presented in open court in the presence of counsel. The written transcript provided to the jury was a verbatim replica of that oral charge. There was no communication from the judge to the jury other than in writing granting their request. The communication was purely administrative and not supplementary ...

*Id.,* p. 3.

This court has held that "messages from a jury should be answered in open court with an opportunity for counsel to be heard before the court responds," but we have also qualified this rule by stating that "a court's ex parte communication with the jury will not require reversal where substantive rights of parties have not been adversely affected." *Petrycki v. Youngstown & Northern Ry. Co.,* 531 F.2d 1363, 1367 (6th Cir.1976). Defendants have presented no evidence to contradict the district court's findings as presented in its order of June 25, 1991. We find that it was error for the district court to respond to a written request from the jury after it had retired for its deliberations without notice to counsel and without retaining the communication for the record. But the defendants have presented nothing more than speculation concerning any possibility of prejudice to the defendants.

Defendants cite this court's holding in *Standard Alliance Ind. v. Black Clawson Co.,* 587 F.2d 813 (6th Cir.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979), that ex parte contact between judge and jury raises a presumption of reversible error, and that under the circumstances of this case, as in *Standard*

*Alliance,* the presumption cannot be rebutted. However, in *Standard Alliance* there was literally no record of the court's ex parte contact through the court's law clerk; "the length and nature of the law clerk's contact with the jury is unknown." *Id.* at 828. Here, the record is not so devoid of information. We have in the record before us the district court's description of precisely what transpired: The jury made a written request for a typed copy of the charge. The judge complied. Defendants' speculative charges of jury confusion are not sufficient.

## VII. Conclusion

For the forgoing reasons we VACATE the punitive damages award, and REMAND the case for consideration of defendants' claims for indemnity and contribution. In all other respects we AFFIRM the judgment of the District Court.