William J. STARK, Plaintiff–Appellant,

v.

ARMSTRONG WORLD INDUSTRIES, INC.; Westinghouse Electric Corp.; General Electric Co., Combustion Engineering; Foster Wheeler Co., Bethlehem Steel Corp., Defendants–Appellees,

Alaska Steamship Co., et al., Defendants.

No. 00–3388.

United States Court of Appeals, Sixth Circuit.

Oct. 3, 2001.

Before BOGGS and DAUGHTREY, Circuit Judges; and WEBER, District Judge.*

BOGGS, Circuit Judge.

William ("Bill") Stark brought two maritime actions, subsequently consolidated, that alleged damages based on exposure to

---

* The Honorable Herman J. Weber, United States District Judge for Southern District of Ohio, sitting by designation.

asbestos. Pursuant to the Jones Act, 46 U.S.C. § 688, and several other legal theories, Stark brought claims against his former shipowner employers, who have been dismissed pursuant to settlement; he also brought products liability and other claims against maritime equipment makers and shipbuilders whose products contained asbestos ("manufacturer defendants"). Over the course of the litigation, a large number of the manufacturer defendants were voluntarily dismissed by Stark. The remaining manufacturer defendants, Bethlehem Steel Corp. ("Bethlehem"), Westinghouse Electric Corp. ("Westinghouse"), General Electric Co. ("GE"), Combustion Engineering ("CE"), and Foster Wheeler Co. ("Foster Wheeler"), moved for summary judgment. All their motions were granted. Stark appeals, claiming to have shown that genuine issues of material fact remain to be resolved. We affirm the dismissal of all five defendants.

## I

Bill Stark went to sea in May 1945, and sailed as itinerant merchant mariner for the next four and a half decades.[1] Stark worked below the decks of eighty different ships during that time, rising to the rank of chief electrician and master's mate by the time of his retirement in 1990. During his years as a seaman, Stark alleges that he worked with numerous pieces of equipment that used asbestos for insulation or other purposes. Stark claims that this asbestos was frequently released in the air, and that within the confines of the engine and boiler rooms, he was forced to inhale friable asbestos fibers, suffering damage as a consequence. Stark has mesothelioma, a form of cancer which can be, and Stark claims was in his case, caused by asbestos exposure.

Stark filed two actions against various defendants seeking compensation for his injury. In June 1994, before Stark had been diagnosed with cancer, he filed an action that was incorporated into the Maritime Asbestos Docket of Northern District of Ohio. In that action, Stark made claims against 113 different defendants, his former employers and numerous manufacturers of maritime machinery. This case moved around the federal court system, with stops at the Judicial Panel on Multi-District Litigation and the United States District Court for the Eastern District of Pennsylvania, for some time.

Regrettably, Stark was diagnosed with mesothelioma in his lung in March 1997. He filed a second action in Louisiana state court, naming only 14 defendants. This action eventually also made its way to the Eastern District of Pennsylvania, where it was consolidated with Stark's earlier case. After consolidation, the case was sent back to the Northern District of Ohio. Stark voluntarily sought dismissal of all those defendants who had not been named in his Louisiana complaint. The six remaining manufacturers moved for summary judgment, claiming that Stark had failed to show a genuine issue of material fact as to whether defendants' products had caused his illness.[2] These motions were granted

---

1. Shortly after oral argument in this case, plaintiff's counsel filed a "Suggestion of Death" with this court, indicating that Mr. Stark has died during the pendency of these proceedings, although the filing does not indicate the date on which this occurred. Due to the nature of our disposition of this case, *infra*, we need not address any effect the plaintiff's death might have on his action.

2. Although Stark's notice of appeal encompassed the summary judgment granted to the sixth defendant, Armstrong World, his appeal omits them from argument and briefing, and it is assumed he has waived this claim. In addition, Stark's complaint also put Bethlehem's boilers at issue, but Stark apparently conceded below that he had never worked

in February 2000. The court held that (1), standing alone, Stark's testimony regarding the defective design of Bethlehem's ships was insufficient to create a genuine issue of material fact as to Bethlehem's responsibility for Stark's cancer. The court also held that (2) Stark had failed to produce "competent evidence" as to when or where he might have used Westinghouse's motors, winches, or marine propulsion turbines,[3] and that (3) Stark's evidence failed to implicate harm arising from General Electric's winches; it refused to consider Stark's claims regarding General Electric's turbines, which he raised for the first time in opposition to GE's motion for summary judgment. Combustion Engineering, which Stark attempted to hold responsible for its boilers, was granted summary judgment because (4) "Plaintiff has not identified any asbestos product for which CE is responsible that was a substantial factor in causing Plaintiff's injuries." The claim against Foster Wheeler, another boiler manufacturer, was dismissed because (5) Stark was found not have worked directly with a Foster Wheeler boiler and Foster Wheeler could not be held responsible for asbestos insulation around pipes that eventually connected to such a boiler. Stark has filed a timely appeal of these decisions.

## II

### Standard of Review

On appeal, we review a grant of summary judgment de novo, using the same Rule 56(c) standard as the district court. *Hansard v. Barrett,* 980 F.2d 1059 (6th Cir.1992). The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989). The burden then shifts to the nonmoving party to come forward with evidence showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Stark's negligence and products liability claims against the equipment manufacturers are brought under the general maritime law, which is "'an amalgam of traditional common-law rules, modifications of those rules, and newly created rules,' drawn from both state and federal sources." *Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520 U.S. 875, 878, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) (quoting *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 865, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)). In maritime law we remain bound, of course, by our circuit precedents and those of the Supreme Court.

An inspection of appellant's briefs shows a marked emphasis on his products liability arguments. To the extent he discusses negligence at all, it is with reference to Bethlehem's alleged negligence in installing, "and its vessels requir[ing] the use of, a component which caused injury." (Stark Reply Br. at 5). Plaintiff does not discuss substantively the issue of standard of care

---

with their boilers, and he does not now assert this claim.

**3.** The court's ruling regarding Westinghouse turbines appears to have been in the alterna-

tive, because it considered this defendant's argument that such claims had not been properly raised to be "well taken."

or whether any of the defendants breached it, confining his arguments to claims of per se liability based on the incorporation of asbestos into defendants' designs and/or their failure to adequately warn users of the danger. The analysis will therefore proceed under the assumption that plaintiff is fundamentally asserting a products liability claim, and generally arguing on the basis of strict liability. Both of these concepts have been incorporated into our admiralty jurisprudence. *See East River*, 476 U.S. at 865–66.

 A products liability claim possesses certain advantages in pleading, which the plaintiff obviously recognizes. As we have explained in the context of a maritime case:

> Although the legal doctrine of strict liability in a products liability case does not impose absolute liability, it is generally characterized as liability without fault because there is no burden placed upon the plaintiff to prove negligence to impose liability since negligence is not an issue. The issue in a strict liability products case is not the degree of care exercised in the design and/or manufacture of the product but, rather, whether the product, when placed into the stream of commerce, was reasonably safe for its intended use in its intended environment, as impliedly warranted by the manufacturer.

*Chotin Transp., Inc. v. United States*, 819 F.2d 1342, 1350 n. 5 (6th Cir.1987) (en banc). Reasonable safety of products is often assessed through use of "risk-utility balancing." *See* RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 2, cmt a (1998)

(noting that "some sort of independent assessment of advantages and disadvantages [of a product], to which some attach the label 'risk-utility balancing,' is necessary" for design defect and failure-to-warn claims); *Krummel v. Bombardier Corp.*, 206 F.3d 548, 552 (5th Cir.2000) (applying the reasoning of this section of the Restatement to admiralty claim, and reversing for failure to apply risk-utility analysis).

 In addition, in order to maintain an action for either negligence or strict liability under maritime law, a plaintiff must show causation of his injury by either the defendant's negligence or the product defect. The Second Restatement describes legal cause of harm as conduct that "is a substantial factor in bringing about the harm[.]" RESTATEMENT (SECOND) OF TORTS, § 431 (1965). In line with this definition, we have adopted a "substantial factor" test as the correct standard for finding proximate cause in maritime asbestos cases pursued under a theory of products liability. *Miller v. American President Lines, Ltd.*, 989 F.2d 1450, 1464 (6th Cir. 1993). Commonly, this standard is separately applied to each of the defendants. As articulated under the law of Ohio, "[f]or each defendant in a multidefendant asbestos case, the plaintiff has the burden of proving exposure to the defendant's product and that the product was a substantial factor in causing the plaintiff's injury." *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196, 1197 (Ohio 1995) (syllabus ¶ 1).[4]

---

4. The plaintiff has provided no authority for an admiralty action to proceed under a market-share liability theory. In any event, market-share liability would be inappropriate here, because the different defendants incorporated asbestos into their products in qualitatively different ways, making it extremely difficult to compare the dangers they generated based only on comparing the relative exposures to their product. *See Goldman v. Johns–Manville Sales Corp.*, 33 Ohio St.3d 40, 514 N.E.2d 691 (Ohio 1987) (rejecting the use of market-share liability in asbestos litigation for this reason).

■ Total failure to show that the defect caused or contributed to the accident will foreclose as a matter of law a finding of strict products liability. *See Matthews v. Hyster Co., Inc.,* 854 F.2d 1166, 1168 (9th Cir.1988) (citing RESTATEMENT (SECOND) OF TORTS, § 402A (1965)). In an asbestos case, to survive a motion for summary judgment, the plaintiff must first identify the defective product that injured him, and its manufacturer. *See Roberts v. Owens–Corning Fiberglass Corp.,* 726 F.Supp. 172, 174 (W.D.Mich. 1989). A defendant does not become liable based on a bare demonstration of "minimal exposure," even when the plaintiff's injuries arise from the relevant toxic substance. *Barnes v. Owens–Corning Fiberglas Corp.,* 201 F.3d 815, 821 (6th Cir.2000) (applying the Kentucky law of strict liability to asbestos claim); *see also Mascarenas v. Union Carbide Corp.,* 196 Mich.App. 240, 492 N.W.2d 512, 517 (Mich.Ct.App. 1992) (finding insufficient a showing that plaintiff's condition was caused by cumulative exposure to the general class of volatile solvents when "plaintiff's own expert could not associate 'organic brain syndrome' with any particular product").

■ The plaintiff must also bring forward some evidence of actual cause; the mere "showing that the asbestos manufacturer's product was present somewhere at his place of work" is insufficient. *Roberts,* 726 F.Supp. at 174 (applying the substantial causation test under Michigan law and § 431); *Mascarenas,* 492 N.W.2d at 516 (same, citing *Roberts*). We do not require that cause necessarily be established by expert testimony. *Miller,* 989 F.2d at 1464. Nonetheless, this court has expressed the concern that "defendants not be subjected to open-ended liability based solely on a jury's inexpert specula-

tion on proximate cause[.]" *Id.* at 1464–65. In a previous maritime asbestos case, albeit unpublished, a panel of this court interpreted the substantial factor test as "requiring a plaintiff relying on circumstantial evidence of exposure to prove causation to show a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural. In other words, *substantial* exposure is necessary to draw an inference from circumstantial evidence that the exposure was a *substantial* factor in causing the injury." *Harbour v. Armstrong World Industries, Inc.,* No. 90–1414, 1991 WL 65201, at *4 (6th Cir. Apr. 25, 1991) (unpublished) (emphasis in original).

*Bethlehem Steel*

Although somewhat in dispute below, the plaintiff currently appears to accept that the three Bethlehem ships on which he served were the *Lurline,* the *Santa Mariana,* and the *Prudential Oceanjet.* Stark worked as a fireman on the *Lurline* for two weeks around Christmas 1948. Much later in his career, he worked as an electrician aboard the *Prudential Oceanjet* from September 1974 through May 1975, and three years later, sailed in the same capacity aboard the *Santa Mariana* for approximately the same period.

As a threshold matter, Bethlehem has pointed out that it is somewhat uncertain whether an ocean-going vessel should be considered a "product," to which all the doctrines of products liability directly apply. This question was extensively contested below, although Bethlehem currently chooses to rely on what it claims is the plaintiff's failure of proof, referring to applicability of § 402A as a question of "academic interest only."[5] (Bethlehem Br. at

---

5. Bethlehem contended (and maintains) that plaintiff in any event failed to plead properly

a strict liability cause of action against its vessels, (Bethlehem Br. at 18 & n. 5), pointing

23). The district court chose not to address this point squarely; its grant of summary judgment was not directly premised of whether a products liability claim could be maintained for "the building, constructing or designing of vessels" on which a plaintiff-seaman sailed, although it held that the "record is devoid of evidence which might convince this Court to be the first to impose liability on a shipbuilder in this context." (Dist. Ct. Op. at 11)

The plaintiff scoffs at this argument, characterizing it as defendant's claim that products liability does not apply to ships "because they are *big.*" (Stark Br. at 15) (emphasis in original). Stark points to strong authority that courts have recently proceeded as if a commercial vessel satisfies the legal definition of product. *See Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 878–79, 883, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) (discussing a vessel as a "manufactured product" in the context of an analysis under § 402A). Although apparently not in the context of a commercial vessel, we also have treated vessels as amenable to products liability in admiralty, again without squarely confronting the problem of definition. *See e.g., Anderson v. Whittaker Corp.*, 894 F.2d 804, 806–07 (6th Cir.1990) (affirming verdict for plaintiffs in general maritime action brought against manufacturer of the capsized *Sea Mar III*, a products liability claim alleging defective design of "1974 model Trojan F–32's").

Under the new Restatement, a product is defined as "tangible personal property distributed for commercial use or consumption. Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules stated in this Restatement." Restatement (Third) of Torts: Product Liability § 19 (1998). Although this definition is itself not the model of precision, most commentators view it as looking to expand the range of things to which product liability law can apply. *See id.* at cmt. b ("most but not necessarily all things are tangible personal property"); *see also* David W. Lanetti, *Toward a Revised Definition of "Product" Under the Restatement (Third) of Torts: Product Liability*, 35 Tort & Ins. L.J. 845, 874 (discussing expansion of doctrines to non-traditional things, such as homes, if they are mass-produced from a common design).

Nevertheless, it is not yet "axiomatic," (*contra* Stark Reply Br. at 2), that the *Lurline, Santa Mariana,* and *Prudential Oceanjet* should be treated as equivalent to normal "products" for all purposes under § 402A. No case regarding an ocean-going commercial vessel appears to have so held, and there remains some basis for treating such chattels differently. As the Supreme Court has recently reiterated: "Admiralty and maritime law includes a host of special rights, duties, rules, and procedures." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 121 S.Ct. 993, 999, 148 L.Ed.2d 931 (2001). Commercial vessels are the

to the absence of any such claim in plaintiff's complaint, the closest being merely an allegation that "Defendants ... committed breach of [sic] implied warranty of fitness for the intended use of the products." (Compl.¶9). This point is well taken, and it does appear that plaintiffs thought of strict liability well into the litigation, yet did not seek amendment of their complaint. Nonetheless, as the

district court did not reject the claim as waived, and Bethlehem does not extensively rely on this ground, we may consider the matter on its merits. *See* Thomas J. Schoenbaum, Admiralty and Maritime Law § 5–6, at 194 n. 22 (3d ed. 2001) (noting that "admiralty courts often recharacterize implied warranty actions as being brought in strict liability in tort").

subject of a legal regime distinct from that governing most other chattels, since under the Jones Act, *inter alia,* the owners of these chattels are subject to expanded liability. Vessels are already subject to "'a species of liability without fault.'" *Miller,* 989 F.2d at 1462 (quoting *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099 (1946)). An important policy justification for strict products liability—which in some sense has followed the lead of the equitable doctrines of admiralty—is to increase the ability of an injured victim to obtain compensation; this policy justification is weaker with regard to commercial vessels.[6]

■■■ At this time, however, we are not required to resolve this question, because assuming on the basis of *Saratoga* that § 402A fully applies and that a vessel is to be analyzed like any other potentially unsafe product, Stark has shown only that (1) he served aboard three Bethlehem-built vessels, (2) and that he saw asbestos floating in the air while working there. According to Stark he has stated a claim because "the design of the vessels required the extensive and continued use of this defective component for their basic operation." (Stark Reply Br. at 3). However, an asbestos-containing product, even one without a warning label, is not inherently defective as a matter of law. *Becker v. Baron Bros.,* 138 N.J. 145, 649 A.2d 613, 617 (N.J.1994). Although not a maritime case, *Becker* involved a plaintiff who

worked for many years as a mechanic, contracted mesothelioma, and died. The plaintiff attributed his illness to occupational asbestos present in the shop environment, particularly as released from brakes. Reversing a jury verdict in favor of Mr. Becker's widow, the New Jersey Supreme Court held that the trial court had erred in not requiring the plaintiff to present product-specific proof of dangerousness. *See id.* at 620–21.

Moreover, Bethlehem points out that its ships were sold to others, who equipped, repaired, and sailed them for some time before Stark served on them. In order to make Bethlehem liable on the basis of a design defect, Stark would have to show that the asbestos he saw in the air derived from Bethlehem's design. Yet Stark provides us with *no* design specifications for *any* of the three ships; had he done so, he would have been in the position to find a defect in those specifications, which defect unreasonably caused the release of the asbestos to which he was exposed. Because the plaintiff has provided no proof of a specific defect, Bethlehem must be dismissed from the case.

*GE and Westinghouse*

■■■ Stark's claims against these manufacturers, whom he now terms the "turbine" defendants, have transmuted over time. He initially pled that his exposure derived from winches and motors manufac-

---

**6.** In situations involving vessels of unique design, there would be considerable difficulty in applying the risk-utility test. As the Fifth Circuit explained in *Krummel,* application of risk-utility analysis usually requires the plaintiff to produce "evidence concerning the frequency of accidents like his own, the economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of his proposed alternative design." 206 F.3d at 551 (internal quotation marks omitted).

Without comparability to other vessels, an accident risk for the putatively unsafe vessel could not easily be estimated. Furthermore, the design decisions for a customized vessel are frequently decisions made by professionals (or the client) rather than by the manufacturer. Architects, including naval architects, are generally not subject to products liability actions. *See* Schoenbaum, § 5–6, at 194. Such vessels resemble custom-designed houses, which are also not likely to be considered "products" under the Restatement.

tured by these defendants, and maintained that this was the basis of his claim throughout discovery, including in response to the district court's order asking him to declare the issues for trial. In response to GE's motion for summary judgment, plaintiff turned his attention to the asbestos contained in the turbine engines carried aboard a number of the vessels on which he served. As a justification for doing so, Stark pointed to his original complaint, which had alleged exposure due to "boilers, generators, etc." (Compl.¶ 6). This he deems to have given the defendants notice that he would make complaints about their marine turbines. The district court refused to address these claims with respect to GE and appears to have done so with regard to Westinghouse, although holding in the alternative that there was a failure of proof as to the latter defendant.

Wisely, Stark does not attempt to ground his notice argument on "etc." Instead, he claims that " 'turbine,' 'generator,' and 'engine' are used almost interchangeably to describe a vessel's main electricity producing machinery." (Stark Br. at 27). In response to GE's understandable skepticism, plaintiff states that one "need have looked no further than a college dictionary." (Stark Reply Br., at 13). Although providing interlocking definitions of turbine and engine, plaintiff's counsel gives no definition for "generator," instead relying on a marine engineering manual that has a section titled "turbine-generator sets." This linguistic miscellany grounds the contention about the "interchangeable nature of the words."

Even if one accepts that a generic reference to an engine would put one on notice that turbine engines are at issue, Stark's complaint mentions *neither of these*, making his comparisons of these two words irrelevant and an apparent smokescreen

for his inability to equate what he actually pled—"generators"—with what belatedly asserted, "turbines." Reference to *our* college dictionary does not support Stark's claims of interchangeability; it says: "engine … a machine for converting energy … into mechanical force or motion." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986). A turbine is "a rotary engine actuated by the reaction or impulse or both of a current of fluid...." *Ibid.* This reflects what is relatively common knowledge and denied by no one, that a turbine is a kind of engine. A generator, however, in the relevant (and closest) definition is a "machine by which mechanical energy is changed into electrical energy." *Ibid.* A generator might technically also satisfy the very broad definition of engine used above, because it will operate by converting an input into motion (or mechanical force) that will in turn create an electrical output. At best, however, this would make generators a distinct subset of "engines" from the subset of engines currently grounding plaintiff's claim, "turbines." A generator and a turbine, although often coupled, are different products performing different functions, and wilful verbal legerdemain by the plaintiff cannot make them "interchangeable."

Not surprisingly for claims asserted so late, Stark's claims about the turbines were in any event inadequate to survive summary judgment. Although there is circumstantial evidence that he worked with these pieces of equipment, which were produced by GE (and in a few cases, Westinghouse), and that he suffered at least minimal asbestos exposure as a result, Stark has failed to develop any evidence of the extent and nature of this exposure, or of the defective design that made this release unreasonable, aside from having the asbestos with him in the engine room. More importantly, although GE did manage to supplement the record below

with testimony attempting a substantive refutation of the turbine claims, neither it nor Westinghouse had anything like the discovery process contemplated by the Federal Rules in which to develop a proper evidentiary record for adjudication of this economically and medically important question.

The district court therefore properly did not consider these claims, and we do likewise. In a somewhat similar maritime asbestos case involving Jones Act plaintiffs, we rejected the consideration of belatedly added passive smoking claims by noting that:

> As a case takes shape and the court struggles to narrow and pinpoint the issues, the parties have a unflagging obligation to spell out squarely and distinctly those claims they desire to advance at the trial proper. Good-faith compliance with Civil Rule 16 plays an important role in this process.

*Smith v. Gulf Oil Co.*, 995 F.2d 638, 643 n. 4 (6th Cir.1993) (citation omitted)

As to GE and Westinghouse, the only claims properly pled in the district court relate to motors and winches, and the plaintiff has now effectively abandoned these claims. Stark's claims based on the turbines are belated, and did not allow the defendants the ability to respond to them during discovery, subjecting them to that level of the adversarial process that must exist even prior to summary judgment. Therefore, GE and Westinghouse must be dismissed.

### CE and Foster Wheeler

 Stark claims to have been exposed to asbestos by the boiler manufacturers in two ways, directly as a consequence of asbestos from their own products and from the asbestos contained in other products "attached to" the boiler. Reading the facts favorably to the appellant, his claim of exposure is supported as to CE. Stark has testified that when he was a "wiper," one of his responsibilities was to climb inside a boiler, filled with asbestos-laden material, and clean the boiler. Stark's service record shows that he served aboard the *Skidmore Victory* as a wiper, and he specifically remembers cleaning a boiler on that vessel. An inspection of American Bureau of Shipping records appears to show that the *Skidmore Victory* was equipped with a CE boiler.

Prolonged exposure of the type Stark claimed he had aboard the *Skidmore Victory* can support an award. *See Miller,* 989 F.2d at 1454 (sustaining award of seaman who had worked, among other things, as a wiper). However, *Miller* is not determinative here, because it involved a suit against the shipowner, which was responsible for *all* the exposure the plaintiff's decedent had experienced, over his 23 years of service on its ships. *See ibid.* Had Stark presented expert testimony to show that cleaning a boiler even once (or perhaps a few times) is sufficiently hazardous to add a meaningful level of cancer risk, summary judgment might well have been improper, because genuine issues regarding causation, dangerousness and unreasonable failure to warn would have been created.[7] Instead, though, Stark relied on his own testimony to establish a circumstantial case. This is permissible, but the rationale in *Harbour* is a persuasive formulation of what the plaintiff must then show—a sub-

---

**7.** The plaintiff asserts, without citation to expert evidence or prior legal determination, that "the boilers were 'bad' because they required the extensive use of asbestos products for their basic operation." (Stark Br. at 24).

As noted with regard to defendant Bethlehem, *supra,* we may not simply assume that an asbestos-containing product fails the risk-utility test and is to be considered dangerous and defective.

stantial exposure for a substantial period of time. Although Stark has shown exposure to asbestos[8] and sufficiently identified its source, his service record shows that he served aboard the *Skidmore Victory* for less than two months, between February 5, 1947 and March 26, 1947. Without testimony that the type of exposure he suffered was particularly harmful, this would seem to be insufficient for a rational jury to find this exposure was a "substantial factor" in Stark's mesothelioma.

Plaintiff analogizes his case against Foster Wheeler to his case against CE, noting that the "main factual difference is that Mr. Stark did not specifically recall cleaning the interior of a Foster Wheeler boiler, ... [b]ut even if he had, it is apparent that this would not have been considered sufficient by the district court." (Stark Br. at 23). Yet it is irrelevant what the district court *would have done* if Stark *had* made his threshold showing. If the plaintiff did not make such a showing, then summary judgment for the defendant must be granted. Although Stark places Foster Wheeler boilers on several ships, on none of the ships did Stark serve as a wiper, meaning there can be no assumption even of exposure.

Stark's other claim regarding the boiler manufacturers relates to equipment attached or connected to their products. On a ship most things are connected to other things: so this claim potentially implicates a broad class of potential sources of exposure. CE dismisses this argument by stating that a genuine issue cannot be created because "CE did not manufacture the products 'attached' to the CE boiler." (CE Br. at 10). The trial judge agreed,

holding that [CE or] "Foster Wheeler is only responsible for its own product—not the products that may be attached or connected to it." Nonetheless, although CE and Foster Wheeler could not be responsible for a *manufacturing* defect under these circumstances, one could argue that a *design* defect claim might exist, if the defective attachments manufactured by others were part of the boiler design and were rendered unsafe due to that design.

In a similar fashion as discussed above with reference to Bethlehem, however, Stark has completely failed to make a design defect argument. He has not provided expert testimony, personal testimony, or record evidence of a design flaw of the type discussed. In essence, he seeks to have Foster Wheeler and CE held responsible because their equipment is integrated into the rest of the machinery of the vessel, much of which uses and may release asbestos. This form of guilt by association has no support in the law of products liability.

### III

For the foregoing reasons, we **AFFIRM** the decision of the district court.

---

8. CE's expert asserts that cleaning the boiler would have occurred only rarely, especially at sea, and that in normal circumstances would have involved no exposure to the encased asbestos in a CE boiler. Stark, however, claims that whatever may have been the case back at the shipyard, the firebricks inside the boiler he cleaned were frequently cracked or broken, exposing the inner asbestos lining.