BARONE, Exr., Appellee,

v.

GATX CORPORATION et al.; John Crane, Inc., Appellant.

[Cite as *Barone v. GATX Corp.*, 167 Ohio App.3d 744, 2006-Ohio-3221.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 2005–T–0069.

June 23, 2006.

The Swartz Law Firm and Dean E. Swartz, for appellee.

McMahon, DeGulis, Hoffmann & Lombardi, L.L.P., and Stephen H. Daniels, for appellant.

DONALD R. FORD, Presiding Judge.

{¶ 1} Appellant, John Crane, Inc., appeals from the May 13, 2005 judgment entry of the Trumbull County Court of Common Pleas, denying its motion for judgment notwithstanding the verdict and granting the motion for a new trial on damages only to appellee, James G. Barone, executor of the estate of Lee Barone ("decedent").

{¶ 2} On November 9, 2002, the decedent died from pleural mesothelioma, a malignant tumor on the lining of the lungs, caused by inhaling particles of asbestos dust. On February 27, 2003, appellee filed a claim for employer intentional tort and wrongful death against appellant, GATX Corporation ("GATX"), General American Transportation Corporation, the Gage Company, I.U. North America, Inc., Garlock, Inc., M.V.G., Inc., and John Doe Companies one to 20. Appellee alleged, inter alia, that the decedent was exposed to asbestos during his employment at GATX and that, as a result, he suffered injuries that ultimately led to his death.[1] On April 4, 2003, appellant filed its answer to appellee's complaint.

---

1. In his brief, appellee includes the history of litigation against John Crane arising out of its involvement at GATX. These cases have no bearing on the outcome of this case.

{¶ 3} A jury trial was held from November 8, 2004, through November 12, 2004. The following undisputed facts were revealed. The decedent was employed at GATX, a company that manufactured and repaired railroad tank cars, from 1944 until the company shut down in 1984. He worked as a stenciler in the finishing or paint shop. Stencilers painted and stenciled information on the railroad tank cars.

{¶ 4} In early 1961, the paint shop burned down, and it took approximately 18 months to build a new shop. During that time, the decedent worked in a temporary paint shop that GATX set up at the end of the repair shop and that essentially doubled the size of the shop.[2] No wall separated the repair shop from the temporary paint shop, just a canvas "door" that was not normally used.

{¶ 5} The only time that appellant could have been exposed to asbestos dust was during the 18 months that he worked in the temporary paint shop, beginning in 1961 and ending in 1962.

{¶ 6} On November 5, 2004, appellant filed a motion in limine to preclude appellee's expert, Dr. William Ewing, from testifying and to prevent the presentation of any evidence concerning the decedent's exposure to asbestos before 1961 or after 1962. Both motions were denied by the trial court. On November 10, at the close of appellee's case, appellant moved for a directed verdict. The trial court also denied this motion.

{¶ 7} The jury returned a verdict in favor of appellee for $32,600 in compensatory damages. The jury did not award punitive damages. The jury found, by interrogatories, that the decedent was exposed to dust from asbestos-containing products sold or manufactured by appellant. Further, the jury found that the decedent's exposure to appellant's products was a substantial factor in causing his injury and death from mesothelioma. On November 15, 2004, the judgment on the verdict was entered.

{¶ 8} On November 24, 2004, appellee filed a motion for additur or, in the alternative, a new trial on damages only. On November 29, 2004, appellant filed a motion for judgment notwithstanding the verdict.

{¶ 9} On May 13, 2005, the trial court denied appellant's motion for judgment notwithstanding the verdict, denied appellee's motion for additur, and granted appellee's motion for a new trial on damages only. It is from this judgment that appellant appeals, raising the following five assignments of error:

---

2.  Prior to the paint shop burning down, it was in a building separate from the repair shop. The newly built paint shop was also separate from the repair shop. Only the temporary paint shop was attached to the repair shop.

{¶ 10} 1. "The [t]rial [c]ourt [e]rred in [d]enying [appellant's] [m]otion for a [judgment notwithstanding the verdict].

{¶ 11} 2. "The trial court erred in admitting the presence of John Crane asbestos containing products at GATX after decedent's alleged exposure to the products.

{¶ 12} 3. "The trial court erred in granting [a]ppellee a new trial.

{¶ 13} 4. "The trial court erred in granting [appellee] a new trial on damages.

{¶ 14} 5. "The trial court erred in allowing expert Mr. Ewing to give new opinions at trial that were not disclosed during discovery."

{¶ 15} In its first assignment of error, appellant presents one issue for review: whether appellant presented sufficient case law and evidence in support of its motion for judgment notwithstanding the verdict. In support of this issue, appellant presents three arguments: (1) appellee failed to introduce evidence that the decedent was in fact exposed to appellant's products, (2) appellee's expert testimony submitted to establish that appellant's products were a substantial factor in causing harm to the decedent was insufficient as a matter of law, and (3) appellee failed to introduce any evidence that appellant failed to warn of health hazards during the time the decedent was allegedly exposed to them.

{¶ 16} With respect to appellant's first argument, "Civ.R. 50(B) governs motions for judgment notwithstanding the verdict. It states, in part, 'a party may move to have [a] verdict and any judgment thereon set aside and to have judgment entered in accordance with [the] motion * * *. But no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence.' A motion for a judgment notwithstanding the verdict presents a question of law regarding the sufficiency of the evidence. See *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 317–319, 21 O.O.3d 198, 423 N.E.2d 856 * * *." *Westfield Ins. Co. v. Paglio* (Aug. 4, 2000), 11th Dist. No. 99–L–022, 2000 WL 1114798, at *9.

{¶ 17} An appellate court's review of a trial court's disposition of a motion for judgment notwithstanding the verdict is de novo. *Felden v. Ashland Chem. Co., Inc.* (1993), 91 Ohio App.3d 48, 55, 631 N.E.2d 689. A motion for judgment notwithstanding the verdict tests the legal sufficiency of the evidence, presenting a question of law for review. *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 219, 58 O.O.2d 424, 280 N.E.2d 896. "A motion for a [judgment notwithstanding the verdict] does not present a question of fact or raise factual issues; rather, it presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence." *Huffman v. Kazak* (Apr. 12, 2002), 11th Dist. No. 2000–L–152, 2002 WL 549858, at *4, citing *Ruta v. Breckenridge–Remy*

*Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935, paragraph one of the syllabus.

{¶ 18} "The appellate court must construe the evidence most strongly in the favor of the nonmoving party and determine whether reasonable minds could only conclude that the moving party was entitled to judgment as a matter of law. If reasonable minds could only conclude that the plaintiff failed to meet his burden on one essential element, then the moving party is entitled to judgment as a matter of law." *Bellino v. Superior Beverage Co., Inc.* (Dec. 28, 2001), 11th Dist. No. 2000–T–0100, 2002 WL 5351, at *6.

{¶ 19} The leading case in Ohio regarding asbestos litigation is *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196.[3] In *Horton,* the Supreme Court of Ohio held that "[f]or each defendant in a multidefendant asbestos case, the plaintiff has the burden of proving exposure to the defendant's product and that the product was a substantial factor in causing the plaintiff's injury." Id. at paragraph one of the syllabus.

{¶ 20} Further, as appellee correctly points out, the Supreme Court also made it clear that "[a] plaintiff need not prove that he was exposed to a specific product on a regular basis over some extended period of time in close proximity to where the plaintiff actually worked in order to prove that the product was a substantial factor in causing his injury." Id. at paragraph two of the syllabus. Appellee relies on this rule of law to purport that he did not have to prove that the decedent personally used, handled, or worked with any of John Crane's products. Further, appellee maintains that this statement makes clear that he did not have to meet any artificial thresholds regarding the duration and proximity of his father's exposure. We agree with appellee's contentions.[4]

---

3. Appellant's brief cites *Lindstrom v. John Crane, Inc.* (N.D.Ohio 2004), 316 F.Supp.2d 603 (*Lindstrom* was affirmed on appeal in *Lindstrom v. A–C Prod. Liability Trust* (C.A.6, 2005), 424 F.3d 488) for the standard a plaintiff must meet to prevail on a products liability asbestos claim: "(1) identify an asbestos-containing product for which each defendant is responsible; (2) prove that he has suffered damages; and (3) prove that the defendant's asbestos-containing product was a substantial factor in causing his damages." Appellee argues that "[i]t is of little value to urge upon this [c]ourt a decision by a federal trial judge in a case involving *peritoneal* mesothelioma (which involves the abdominal cavity, not the respiratory system) that relies on decisions of other federal trial judges including one from Michigan as John Crane has done." (Emphasis sic.) We disagree with appellee. Further, for this proposition of law, *Lindstrom* also cited *Stark v. Armstrong World Industries, Inc.* (C.A.6, 2001), 21 Fed.Appx. 371, which explicitly cites *Horton* as its controlling law in asbestos litigation. We conclude that the standards of law set forth in *Horton* and *Lindstrom* are essentially the same.

4. In *Horton,* 73 Ohio St.3d 679, 653 N.E.2d 1196, the Supreme Court explicitly rejected the rule of law set forth in *Lohrmann v. Pittsburgh Corning Corp.* (C.A.4, 1986), 782 F.2d 1156. According to Lexis's prior history notes in *Horton, Lohrmann,* at 1162–1163, set forth the "frequency-proximity" test. Under this test, in order to escape summary judgment, a plaintiff

{¶ 21} However, under *Horton,* 73 Ohio St.3d 679, 653 N.E.2d 1196, a plaintiff still bears the burden of "proving exposure to the defendant's product." Id. at paragraph one of the syllabus. Appellee reiterates this requirement when he states, "Applying this standard [referring to paragraph two of the syllabus in *Horton* ] to the circumstances of this case, [he] thus needed to present evidence only that his father was *exposed* to dust from the John Crane's asbestos-containing products." (Emphasis sic.) We agree with this assertion. However, at a minimum, we believe that appellee had to show that appellant's products were used or purchased by GATX during the pertinent exposure period. It is only common sense that in an elemental-causation analysis, if an asbestos-containing product was not used by or purchased by the employer, then it is impossible for the employee to have been exposed to dust from that product.

{¶ 22} In this case, appellee presented the trial testimony of three former GATX employees, Phillip Greer, Dominic Leone, and Thomas Pass, and the video-deposition testimony of Ronald Candor to show that the decedent had been exposed to appellant's products. Appellant contends that "[a]ppellee presented no evidence whatsoever that [the decedent] worked with or around any John Crane asbestos containing products during [the relevant time period]." Appellee maintains that "[t]estimony from [the four] former GATX workers established that John Crane's asbestos-containing products were used in the [r]epair [s]hop resulting in [the decedent's] exposure to asbestos dust in 1961 and 1962."

{¶ 23} Thus, it is imperative for us to thoroughly review the testimony of these four witnesses in order to determine whether appellee presented sufficient evidence to establish that the decedent was exposed to John Crane asbestos-containing products. In order to resolve this issue, we must first determine whether there was sufficient evidence that John Crane products were in fact purchased or being used by GATX during the relevant time period, from 1961 to 1962. If we so determine, then we must ascertain whether there was sufficient evidence to show that the decedent was actually exposed to those products.

{¶ 24} Appellee presented Greer as his first witness. Greer was employed by GATX for 25 years, beginning in 1960. He stated that he knew the decedent. During Greer's employment at GATX, he held 26 jobs, including working as a laborer, doing mail-related jobs, timekeeping, material dispatching, doing supervi-

---

had to present evidence of " 'exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.' " The Supreme Court reasoned that this test would undermine debate in the scientific and medical community concerning the possibility that even short periods of exposure to asbestos can cause harm to persons. *Horton,* 73 Ohio St.3d at 684, 653 N.E.2d 1196. Further, it would make it impossible for plaintiffs to ever prevail on the "fiber drift" theory, which is a belief held by some scientists that asbestos "fibers and particles to 'take flight' and sail into the air" and could injure persons not in the immediate proximity of the asbestos product. Id.

sory work, and working in the warehouse. He explained that as a timekeeper, he would keep track of what jobs people worked on, because the jobs were all piecework. As a material dispatcher, he would have to gather all of the items, either from the warehouse or the steel yard, that were specified on the bill of materials as items that would be needed in order to work on a particular tank car.

{¶ 25} Greer stated that asbestos was used in the repair of the railroad tank cars. He knew this because "when the repair order came down," it would indicate what gasket had to be replaced. The bill of materials stated that the gaskets were asbestos. Greer explained that GATX did not get all of its gaskets from one supplier; "the unwritten rule" was that an employee ordered from three or four different suppliers. When asked whether the bill of materials specified exactly what kind of asbestos gaskets were used, or who the manufacturer was, Greer replied, "If a customer in the repair shop, which are basically [GATX manufactured cars], we used generic ones and it would be like a JM60. That number just seems to always ring a bell when I talk about gaskets." Greer stated on cross-examination that JM60 gaskets were made by Johns Manville, not by John Crane.

{¶ 26} Greer testified that drawings shown to him, one from 1967 and one from 1971, were examples of tank-car drawings that the workers used to get when they received an order. He stated that the first drawing, from 1971, showed a gasket marked "Crane Number 888." Greer agreed that similar drawings were used in the early sixties, but that they had older nomenclature. Greer stated that another graphic, dated 1967, represented a JM60 bolster gasket. He agreed that it was a typical drawing of a bolster gasket that would have been used in 1961 or 1962.

{¶ 27} Greer also identified documents that were labeled "GATX Tank Car Division Estimate Data Sheet." He stated that these documents were estimates sent to customers for every building order. Greer testified that one particular document, dated 1968, indicated that the types of gaskets that would be used were described as " '[a]ll gaskets JM60 or equal.' " He stated that as long as a gasket fit, it would be used, regardless of who the manufacturer was. When asked whether he knew if there was a John Crane equivalent to a JM60, he replied, "I knew that we got them from there from my experience in the warehouse of, I used to have to receive stuff in." [5] He also agreed that this document would be similar to ones used in 1961 and 1962.

{¶ 28} In addition, Greer identified purchase orders, dated 1976 through 1979, that showed the types of gaskets that GATX bought from Mahoning Valley

---

5. Greer admitted on cross-examination that he did not work in the warehouse until 1965.

Gasket Company, including John Crane, Garlock, Teflon, and generic gaskets. When asked whether these were the same types of asbestos materials that were being used and ordered at GATX in 1961 and 1962, Greer responded, "As far as I can remember, that material thing never really changed." When further asked whether the suppliers and manufacturers were constant during the years 1961 through 1979, he responded, "To the best of my knowledge they would have been the same."

{¶ 29} On cross-examination, Greer stated that the first time he became aware of John Crane products at GATX was in 1965, when he temporarily worked in the receiving department in the warehouse. He agreed that during his deposition in September 2004, he had thought that the first time he saw John Crane products at GATX was in the mid-seventies. However, he stood by his trial testimony that his recollection then was that he first saw John Crane products in 1965.

{¶ 30} Leone testified after Greer. Leone began his employment at GATX in 1947 and worked there until the company closed. He began working in the paint shop in 1960. Leone did not testify as to whether he had any knowledge whether GATX purchased or used John Crane asbestos products.

{¶ 31} Pass testified next. He began working at GATX in August 1962, in medium weld, but moved to the repair shop in 1965. He stated that when he began his employment in 1962, the temporary paint shop had already been moved into the new paint shop building.

{¶ 32} Pass was asked, "[W]hen you worked in the repair shop [which was not until 1965] doing the things that you said that you did, were you aware of who the manufacturers were of the asbestos material you were using?" He replied, "Not at that time I didn't." Pass was then asked, "At some point later in your career did you learn about what kind of asbestos materials were being used in the repair shop?" He replied that he did.

{¶ 33} Then, Pass was asked if he knew the names of any of the manufacturers of the asbestos sheet material that he cut in the repair shop.[6] He replied that he remembered one that was shaped like a diamond, which had a "J" in the middle. After his recollection was refreshed, he remembered that the material was John Crane's material. He admitted that he did not learn that the product was manufactured by John Crane until "later on in time."

{¶ 34} Finally, the video deposition of Candor was shown at trial. Candor worked at GATX from May 1962 until the company shut down. When he was first employed there, he worked in medium weld as a sweeper or raker. When the temporary paint shop moved to the new building, he was still a sweeper.

---

6. Pass did not work in the repair shop until 1965.

Eventually, he moved to the repair shop. He did not testify as to whether John Crane products were ever present at GATX.

{¶ 35} As the Supreme Court of Ohio stated in *O'Day*, supra, 29 Ohio St.2d at 219, 58 O.O.2d 424, 280 N.E.2d 896, "a review of the evidence is more often than not vital to the resolution of a question of law." Moreover, "the fact that a question of law involves a consideration of the facts or the evidence does not turn it into a question of fact. Nor does that consideration involve the court in weighing the evidence or passing upon its credibility." Id. at 219, 280 N.E.2d 896. In the case sub judice, after reviewing the facts, we agree with appellant that the evidence was not sufficient to be submitted to the jury and that the trial court erred when it did not grant appellant's motion for judgment notwithstanding the verdict.

{¶ 36} Appellee contends, "There was uncontroverted testimony that John Crane asbestos-containing products, including gaskets and sheet gasket material, were used at the plant." We agree with that statement, but not in relation to the years prior to 1965. Appellee further contends that Greer testified that GATX did not get its asbestos gaskets from one manufacturer, but from three or four. It would be sheer speculation to conclude from that statement that appellant's products were one of those three or four suppliers. There was no evidence that there were only three or four manufacturers supplying asbestos gaskets at that time, or even that they were one of the top sellers of asbestos gaskets.

{¶ 37} In his brief, appellee maintains, "When Mr. Greer was asked if there was a John Crane 'equivalent' asbestos material for 'JM60' (a Johns–Manville product), he answered 'no questions about that.'" However, "no questions about that" was not the answer to the question presented. His actual reply to that question was "I knew that we got them from there from my experience in the warehouse of, I used to have to receive stuff in [in 1965]. In the shop we kept them by piles, so when a specific order called for whatever you would use those. But, like I said, if that pile ran out and that other pile fit, one came off that other pile, no questions about that." What Greer was referring to when he said "no question about that" was that there was no question about the fact that they would use whatever gasket they had available that fit a particular tank, no matter who the supplier was.

{¶ 38} Moreover, appellee had been referring to a building order estimate that stated, "All gaskets JM60 or equal," which was dated 1968. Greer agreed that the building order was similar to one that would have been used in 1960 or 1962. However, simply because a form that a company uses in one year is similar to one they use in later years, it does not mean that the information on the form would in any way be similar from year to year.

{¶ 39} Appellee also argues that engineering drawings of Crane gaskets from 1971 were "fairly typical" of drawings in 1961 and 1962. Again, for the reasons stated in the foregoing paragraph, just because an engineering drawing showing the width and size of a gasket is typical of drawings a company used in the early sixties, it does not mean that the gasket would be from the same manufacturer.

{¶ 40} Appellee contends that Pass identified John Crane products after looking at one of its catalogs and that he stated that it was the same material that he used to cut when he worked in the repair shop. However, Pass did not work in the repair shop until 1965. Moreover, Pass admitted that while he worked in the repair shop, he was not aware of the different manufacturers of asbestos. He agreed that he learned "later in [his] career" who the different asbestos manufacturers were.

{¶ 41} Appellee's best evidence stems from Greer's testimony regarding products listed on purchase orders used from 1976 to 1979, which identified the types of gaskets that GATX bought at that time, including John Crane asbestos gaskets. When asked whether he knew that the materials would have been the same in 1961 and 1962, Greer replied over objection, "[T]o the best of my knowledge they would have been the same," and "As far as I can remember, that material thing never really changed." We note that although Greer was quite a versatile employee, working at 26 different jobs throughout his 25 years at GATX, he never worked in purchasing. Further, Greer admitted that he was not aware of John Crane products until 1965, when he temporarily worked in the receiving warehouse. Thus, we conclude that Greer's testimony regarding whether GATX purchased John Crane products in 1961 and 1962 was conjectural and not a competent expression of opinion or knowledge.

{¶ 42} Appellee argues that a "[p]laintiff may prove exposure through circumstantial evidence." We do not disagree with that proposition. In fact, we agree with the Fourth District's reasoning in the case cited by appellee for this rule of law. In *McGee v. Goodyear Atomic Corp.* (1995), 103 Ohio App.3d 236, 659 N.E.2d 317, the appellate court stated, "Certainly, there is no direct evidence of the decedent's exposure to any toxic levels of TCE [an organic solvent known as trichloroethylene] at any given time or place during his lengthy employment at the plant. It is highly unlikely that anyone would anticipate the need, or have the degree of sophistication necessary, to maintain daily logs of his moment-by-moment exposure to toxic fumes over an employment period spanning roughly fifteen years. Proof of such exposure (in retrospect) would have to be garnered through use of indirect, or circumstantial, evidence." Id. at 242, 659 N.E.2d 317.

{¶ 43} In *McGee,* the plaintiff had presented a plethora of circumstantial evidence to survive summary judgment by showing that the decedent was exposed to TCE and that TCE caused the decedent's liver cancer. In the case at

bar, analogous to *McGee*, there was circumstantial evidence to show that the decedent was exposed to asbestos fibers and that those fibers caused his mesothelioma. There simply was no evidence presented, circumstantial or direct, that showed that it was John Crane's products that the decedent was exposed to during the relevant time period.

{¶ 44} The other case cited by appellee for the same proposition regarding circumstantial evidence was *Bush v. Abex Corp.* (1989), 64 Ohio App.3d 402, 581 N.E.2d 1119. The facts in *Bush* are wholly distinguishable from the case at hand. In *Bush*, the defendants, asbestos manufacturers, filed motions for summary judgment, arguing that the plaintiff had not shown any evidence that he had been exposed to asbestos that came from their companies. The trial court agreed. However, the appellate court reversed. Unlike the case here, in *Bush*, there was actually testimony from other employees who worked with the plaintiff and who specifically remembered seeing the defendant's products in the plant when the plaintiff, who worked in the chemical lab, was employed there. Further, testimony showed that the plaintiff tested every product in the lab that came into the plant. In addition, there was documentation that showed when the employer began using each defendant's asbestos product and that those time periods coincided with the time period of plaintiff's employment.

{¶ 45} Thus, we agree that a "plaintiff need not prove that he was exposed to a specific product on a regular basis over some extended period of time in close proximity to where the plaintiff actually worked" in order to prove that the product was a substantial factor in causing his injury. *Horton*, 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph two of the syllabus. However, we believe that there needs to be *some* evidence that the product was at a plaintiff's place of work during the time of an alleged exposure.

{¶ 46} Here, construing the evidence in a light most favorable to appellee, reasonable minds could come to only one conclusion regarding the facts in evidence as to whether appellant's products were at GATX from 1961 to 1962, and that conclusion, as a matter of law, is adverse to appellee. Therefore, appellant's first assignment of error has merit.

{¶ 47} In his second assignment of error, appellant argues that the trial court erred in admitting evidence that showed that appellant's products were at GATX after 1962. Specifically, appellant maintains that evidence of its products being at GATX after 1962 is irrelevant because it was established that the decedent's exposure was limited to an 18–month period beginning in early 1961. For the reasons given in the foregoing analysis, as well as those that follow, we agree.

{¶ 48} In *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056, the Supreme Court of Ohio stated:

{¶ 49} "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence. The admission of relevant evidence pursuant to Evid.R. 401 rests within the sound discretion of the trial court. An appellate court which reviews the trial court's admission or exclusion of evidence must limit its review to whether the lower court abused its discretion. As this court has noted many times, the term 'abuse of discretion' connotes more than an error of law; it implies that the court acted unreasonably, arbitrarily or unconscionably." (Citations omitted.)

{¶ 50} Evid.R. 401 defines "relevancy" as follows: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

{¶ 51} Appellant relies on *Brooks v. Mihm* (May 3, 1995), 4th Dist. No. 93 CA 24, 1995 WL 264861, for this argument. In *Brooks,* the Fourth District affirmed the trial court's exclusion of any evidence of the plaintiff's work environment prior to his date of hire and any evidence after he filed his complaint. Id. at *5. The appellate court stated, "The court found information regarding the workplace environment outside of this time span to be irrelevant * * *." Id. We also agree with the reasoning of *Brooks* and conclude that the trial court abused its discretion when it admitted irrelevant evidence that showed that John Crane's products were being used and purchased by GATX after 1962. This evidence has no bearing on whether John Crane products were at GATX when the decedent was allegedly exposed to them.

{¶ 52} Accordingly, appellant's second assignment of error has merit.

{¶ 53} Appellant's third and fourth assignments of error have been rendered moot by our disposition of the first two assignments.

{¶ 54} In its fifth and final assignment of error, appellant argues that the trial court erred by permitting appellee's expert, William Ewing, to give surprise opinions at trial that were not disclosed during discovery.

{¶ 55} As we stated in our discussion of appellant's second assignment of error, the admission or exclusion of evidence is within the sound discretion of the trial court, and unless the trial court abused its discretion, an appellate court should not interfere. *Waste Mgt. of Ohio, Inc. v. Mid–Am. Tire, Inc.* (1996), 113 Ohio App.3d 529, 533, 681 N.E.2d 492.

{¶ 56} Civ.R. 26(E)(1)(b) provides that a party must supplement "the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify." The Supreme Court has held that "[a]lthough Civ.R. 26(E)(1)(b) does not require a party to give an opposing party notice of every nuance of an expert's opinion, it does require supplementation of the subject matter on which an expert is expected to testify." *Waste Mgt.*, supra, at 533, 681 N.E.2d 492. "The purpose of this rule is to prevent trial by ambush. If discovery is to serve its purpose, the parties must be entitled, upon the unveiling of a contention, to a reasonable opportunity to prepare to defend against it." Id. We note that " 'Civ.R. 37 permits the exclusion of expert testimony pursuant to a motion in limine as a sanction for the violation of Civ.R. 26(E)(1)(b).' " *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 84–85, 19 OBR 123, 482 N.E.2d 1248, quoting *Jones v. Murphy* (1984), 12 Ohio St.3d 84, 12 OBR 73, 465 N.E.2d 444, syllabus.

{¶ 57} Appellant argues that appellee identified Ewing as an expert witness and disclosed that he would testify about the asbestos-containing products releasing hazardous concentrations of asbestos fibers into the air, but at his deposition, Ewing stated that he did not have such an opinion. Specifically, appellant asserts that at Ewing's deposition, appellant asked Ewing whether he was going to offer any opinions regarding fiber release numbers with respect to the grinding of asbestos gasket material and that Ewing replied, "Not quantitative numbers, no." Appellant asserts that at trial, Ewing did just that. After reviewing Ewing's deposition testimony, as well as his trial testimony, we conclude that it was not an abuse of discretion for the trial court to admit Ewing's trial testimony.

{¶ 58} Very early in Ewing's deposition, the following exchange took place between appellant's counsel and Ewing:

{¶ 59} "Q. Have you brought with you everything that you feel is germane to this that is in your file?

{¶ 60} "A. It asks for a lot of stuff that I—some of which I have no idea what they are talking about, other stuff, financial data and so on, I don't have such documents.

{¶ 61} "I brought with me what I would normally bring, which is my file, any correspondence regarding this case and Mr. Barone. I did my best to guess at what—there were some particular articles that I knew that I would like to rely upon and made copies of those and put those in. My CV, that kind of thing.

{¶ 62} "Q. What made you choose the particular articles that you put in your file?

{¶ 63} "A. They were two articles that—well, one is an article and one is a paper that I wrote. The paper I would rely upon for an opinion about settling of asbestos fibers over time, and I suspect I would be asked a question about that at trial.

{¶ 64} " * * *

{¶ 65} "Q. Did you think that you were going to be testifying today about any specific fiber release numbers from any specific product regarding specific application?

{¶ 66} "A. I really wouldn't expect to be asked much about that.

{¶ 67} "Q. Because I noticed * * * that you mentioned, and I can only term it an exposure history, that there was some grinding of gasket material. Do you recall that?

{¶ 68} "A. Yes.

{¶ 69} "Q. Are you going to be offering any opinions regarding any fiber release numbers regarding the grinding of gasket material?

{¶ 70} "A. Not quantitative numbers, no.

{¶ 71} "Q. There was also something regarding the removal of preformed gaskets. Do you plan on offering any testimony quantitatively regarding the fiber release numbers from removing preformed gaskets?

{¶ 72} "A. Again, I doubt that I would offer quantitative numbers from your question, it is possible that I could, depending on how the question went.

{¶ 73} "Q. Was it your understanding today that you would be comparing any sort of fiber release from the use or removal of gasket material to any governmental standards? Saying it is above or below or anything like that?

{¶ 74} "A. Well, I am prepared to do that if I am asked."

{¶ 75} At trial, the following exchange took place between appellee's counsel and Ewing regarding a 1978 John Crane document showing the measurements of the number of asbestos fibers released while manufacturing gaskets from sheet packing by use of dies and a circle cutter:

{¶ 76} "Q. Let's just look at the first [number], the one for 1978. Will you explain to the jury the significance of the numbers on that line from July 11, 1978?

{¶ 77} "A. The OSHA [Occupational Safety and Health Administration] standard in effect in 1978 had two different exposure levels and one was called an eight-hour time-weighted average and the other was called a short term excursion limit, which at that time was defined as or about 15 minutes was typically what was done. And so one, one measurement is for the excursion limit to see

whether someone was over that level or the eight-hour time-weighted average, which is the all day exposure.

{¶ 78} "Q. Let me just ask this; are the measurements that are reflected on that line for July 1978, do those reflect significant exposures to asbestos?

{¶ 79} "A. Yes.

{¶ 80} "Q. Let me ask this question; would you expect as an industrial hygienist for there to be higher levels than reflected on that line which you have highlighted by using a power grinder on this same material as opposed to using a die cutter or a circle cutter?

{¶ 81} " * * *

{¶ 82} "A. You would expect them to be higher than that.

{¶ 83} "Q. Significantly higher?

{¶ 84} " * * *

{¶ 85} "A. Yes, you would expect them to be significantly higher."

{¶ 86} Based on our review of this testimony, we conclude that the trial court did not abuse its discretion when it permitted Ewing to testify. In order for us to find that the trial court abused its discretion, it would have to be palpably evident that Ewing offered a surprise opinion, which appellee had known about prior to trial and failed to disclose to appellant. However, after reviewing both the deposition testimony and the trial testimony, we conclude that Ewing did not offer a surprise opinion.

{¶ 87} At the deposition, appellant's counsel asked a very generic question regarding "specific fiber release numbers from any specific product regarding any specific application." At trial, the testimony concerned Ewing's opinion about a specific document, his expertise as an industrial hygienist with respect to what the numbers on that document meant with respect to OSHA standards, and his opinion as to whether the numbers would be higher upon a different application. Ewing's response at trial did not give a specific quantitative number; rather, he gave a general response to the question. Moreover, it appears from Ewing's deposition testimony that he actually informed appellant that he was prepared to talk about the comparison of fiber-release numbers for gasket materials to government standards (i.e., OSHA standards). Thus, the trial court did not abuse its discretion in admitting this evidence.

■ {¶ 88} Appellant further argues that Ewing testified in his deposition that he had not seen any evidence that the decedent was exposed to asbestos from air hoses and that he did not have an opinion as to this. He then argues

that at trial, Ewing testified that the decedent would have had significant exposure from the use of air hoses. We disagree.

{¶ 89} Reviewing the pertinent testimony, we conclude that Ewing testified in his deposition that although he did not expect to be asked to give an opinion regarding the decedent's exposure to asbestos from air hoses, he stated that he "could very well be asked" that question. In fact, Ewing stated in his deposition immediately following the previous statement, "Assume this for a minute. Assume that somebody, you know, used an air hose to clean up some asbestos-containing debris and [the decedent] was 15 feet away and they were blowing it down, and you think that would be an opportunity for him to be exposed, my answer would obviously be yes. How much was his exposure, I don't know."

{¶ 90} Finally, appellant argues that Ewing testified in his deposition that he could not offer any testimony regarding the decedent's exposure to John Crane's asbestos-containing products, but that at trial, in response to a hypothetical, he did offer such testimony. However, after reviewing Ewing's trial testimony and his response to the hypothetical presented to him, we find that Ewing did not contradict his deposition testimony. The hypothetical presented to him never specified John Crane asbestos-containing products. It merely referred generically to asbestos-containing products.

{¶ 91} Thus, after reviewing the relevant testimony, we conclude that the trial court did not abuse its discretion in permitting Ewing to testify. Appellant's fifth assignment of error is without merit.

{¶ 92} Accordingly, based on the foregoing analysis, appellant's first and second assignments of error have merit. The third and fourth assignments of error have been rendered moot by the disposition of the first two assignments of error, and the fifth assignment of error is without merit. Therefore, the judgment of the Trumbull County Court of Common Pleas is reversed, and the cause is remanded. On remand, the trial court is instructed to enter judgment notwithstanding the verdict for appellant.

Judgment reversed
and cause remanded.

GRENDELL and RICE, JJ., concur.